Per Curiam :
This is a suit for the value of plaintiff’s pos-sessory interest under a contract which expired by its own terms, wherein the Secretary of the Interior declined to renew plaintiff’s right to operate two lodges in the Rocky Mountain National Park. The case was referred to Trial Commissioner Mastín G. White, pursuant to Rule 45, with directions to make findings of fact and recommendations for conclusions of law. The Commissioner has done so in a report filed November 16,1962.
Since the Commissioner has found that the plaintiff has not affirmatively established, in the circumstances of this case, that book value does not fairly compensate him for his possessory interest, we adopt the report and opinion of the Commissioner with a minor modification. Therefore, judgment is entered for plaintiff in the sum of $10,263.69.
Commissioner White’s opinion, as modified and approved by the court, is as follows:
OPINION OP COMMISSIONER
The plaintiff brings this action because the Secretary of the Interior declined to renew the plaintiff’s right to operate two lodges in the Rocky Mountain National Park, when the plaintiff’s existing right to operate the lodges expired at the close of December 31,1958.
For a period of approximately 40 years, beginning about 1918 and extending through the year 1958, members of the plaintiff’s family operated Bear Lake Lodge and Fern Lake Lodge on the eastern slope of the Rocky Mountains in the State of Colorado, and within the boundaries of the Rocky Mountain National Park. The two lodges were located about 5 miles apart. At first, the facilities at the lodges were quite simple, but in the course of time extensive improvements were made, so that each lodge ultimately consisted of a complex of buildings and equipment for the housing, feeding, and entertainment of the public. A total of 28 buildings, sufficient to accommodate 75 guests, were constructed at Bear Lake Lodge; and 13 buildings, sufficient to accommodate 35 guests, were constructed at Fern Lake *720 Lodge. Some of the buildings were made of logs, others were of log-and-frame construction, others were of conventional frame construction throughout, and some were made of log slabs. (For the sake of convenience, Bear Lake Lodge and Fern Lake Lodge will usually be referred to hereafter in the opinion as “the lodges.”)
The lodges were comfortable establishments. The buildings were well constructed, they were maintained in good condition, and they were comfortably furnished. Excellent food was served. However, the chief assets of the lodges were their settings amid beautiful scenery and the pervading atmosphere of remoteness from the world.
The buildings and equipment at the lodges were provided at the expense of the plaintiff’s family, but they were located on Government-owned lands with the consent of the Government (represented by the National Park Service, Department of the Interior, as the agency administering the Bocky Mountain National Park). Contracts with the Government, covering successive terms within the 40-year period previously mentioned, defined the rights and obligations of the parties.
During the early part of the 40-year period previously referred to, the lodges were operated by the plaintiff’s mother and her then husband, who was the plaintiff’s stepfather. The plaintiff’s stepfather withdrew from the enterprise in 1926. Thereupon, the plaintiff’s mother took over the operation of the lodges, and the plaintiff, who was 18 years of age at the time, became her active assistant. Later, as the plaintiff and a brother attained maturity, the operation of the lodges became a partnership affair, with the plaintiff’s mother, his brother, and the plaintiff each having a one-third interest in the business. In 1942 or 1943, the plaintiff’s brother withdrew from active participation in the business, and sold his one-third interest in the partnership to the plaintiff’s mother and the plaintiff for $20,000. Thereafter, for approximately 10 years, the lodges were operated on a partnership basis by the plaintiff’s mother and the plaintiff, each owning a one-half interest in the enterprise.
On September 9, 1952, the plaintiff’s mother assigned to the plaintiff “all of her right, title, and interest in and to” *721 the lodges and tlie contract with, the Government under which they were then being operated. The plaintiff agreed to pay his mother, as consideration for the assignment of her one-half interest in the business, $3,000 per year out of the future profits from the operation of the lodges, if the annual profits, after the payment of taxes, should equal or exceed the figure indicated.
At the time when the plaintiff became the sole operator of the lodges in September 1952, the enterprise was being conducted under contract No. X-100np-129 with the Government. That contract, as extended, covered the period from January 1,1949, through December 31,1953.
After contract No. I-100np-129 expired at the close of December 31, 1953, it was replaced by contract No. 14-10-232-40. The latter contract is the one that is directly involved in the present case. It was between the plaintiff and the Government (acting through a contracting officer of the Department of the Interior), and it covered the 5-year period from January 1, 1954, through December 31, 1958.
Of special significance in connection with the present litigation were paragraphs (a) and (b) of Section 5 and paragraph (b) of Section 12 of contract No. 14-10-232-40. Those paragraphs provided in pertinent part as follows:
Seo. 5. Concessioner’s Improvements, (a) “Conces-sioner’s improvements,” as used herein, means buildings, structures, fixtures, equipment and other improvements affixed to or resting upon the lands assigned hereunder in such manner as to be a part of the realty, provided by the Concessioner for the purposes of this contract * * *.
(b) It is the intention of the parties that the Conces-sioner shall have a possessory interest in all Concession-er’s improvements consisting of all incidents of ownership, except legal title which shall be vested in the United States. * * * The said possessory interest shall not be extinguished by the expiration or other termination of this contractj and may not be terminated or taken for public use without just compensation. * * *
*****
Seo. W. Compensation for Concessioner’s Possessory Interest.
*722 (b) If the Secretary shall determine that, during the term of this contract or upon its termination for any reason, it is desirable to discontinue the operations authorized hereunder, or any of them, and/or to abandon, remove, or demolish any of the Concessioner’s improvements, then the Secretary will, before making such determination effective, take such action as may be necessary to assure the Concessioner of compensation (1) for its possessory interest in such improvements in an amount not less than their book value * * *; (2) for the cost of restoring the land to a natural condition; (3) for the cost of transporting to a reasonable market for sale such movable property of the Concessioner as may be made useless by such determination; and (4) for the actual cost to the Concessioner of such removal or demolition, less salvage, resulting therefrom.
Contract No. 14-10-232-40 remained in effect during the entire 5-year period that was provided for in the contract. It expired under its own terms at the close of December 31,1958.
Upon the expiration of contract No. 144L0-232-40 at the close of December 31,1958, the Secretary of the Interior declined to renew the plaintiff’s right to operate the lodges. The Secretary had determined that it was desirable to discontinue such operations in their entirety and to abandon, remove, or demolish all of the concessioner’s improvements. The present action grew out of the Secretary’s decision.
The plaintiff’s primary contention in the present litigation is that there was a taking of his property by the Government in January 1959, within the meaning of the provision in the Fifth Amendment to the Constitution which declares, “nor shall private property be taken for public use, without just compensation”; and, accordingly, that he is entitled to just compensation for such property. The amount of the just compensation is said by the plaintiff to be $406,288. It appears that this figure was computed by the plaintiff on the basis of a formula that involved the estimated reproduction-cost-new of the lodges as of January 1959,[1] less estimated depreciation.
There are two reasons why the plaintiff’s primary contention cannnot be accepted.
*723 In the first place, there was no taking by the Government of any property belonging to the plaintiff. In substance, the plaintiff’s claim is based solely upon the loss of the right to operate the lodges. That right was not taken from him by the Government. Instead, it expired in accordance with the express terms of a contract between the plaintiff and the Government. The Government (acting through the Secretary of the Interior) merely declined to renew the plaintiff’s right after its expiration, as the Government was legally entitled to do.
In the second place, if there had been a taking of the plaintiff’s property by the Government, the plaintiff’s damages would not be calculated on the basis of the reproduction-cost-new of the property taken, less depreciation. Such a formula is sometimes used in determining the value of a public utility company’s property for rate-fixing purposes, but it is not the accepted method of determining just compensation in a taking case under the Fifth Amendment. It has been held that the compensation to be paid under the Fifth Amendment for the taking of property by the Government is the value of the property taken; and, ordinarily, market value fairly arrived at is the criterion that is used. United States v. Miller, 317 U.S. 369, 374 (1943); General Motors Corporation v. United States, 323 U.S. 373, 379 (1945); United States v. Toronto Nav. Co., 338 U.S. 396, 402 (1949). Market value is what a willing buyer would pay in cash to a willing seller; and it is to be determined as of the date of the taking of the property. United States v. Miller, supra, at p. 374.
The action that the plaintiff complains of — i.e., the refusal of the Secretary of the Interior to renew the plaintiff’s right to operate the lodges upon the expiration of contract No. 14-10-232-40 — was a contingency that the parties contemplated and expressly provided for in paragraph (b) of Section 12 of the contract, previously quoted in this opinion. Consequently, we must look to that paragraph in order to determine the rights and obligations of the parties in the situation that arose upon the expiration of contract No. 14-10-232-40 and the refusal of the Secretary of the Interior to renew the plaintiff’s right to operate the lodges.
*724 The parties agreed in paragraph (b) of Section 12 that the plaintiff would be entitled to compensation if, upon the expiration of contract No. 14^10-232-40, the Secretary of the Interior should decide not to renew the plaintiff’s right to operate the lodges; and the parties further agreed on the elements that should be taken into account in fixing the plaintiff’s compensation.
Paragraph (b) of Section 12 declared that the plaintiff would be entitled to compensation, first, “for * * * [his] possessory interest in such improvements in an amount not less than their book value.” The plaintiff contends that, in order to determine the book value of the plaintiff’s improvements at the expiration of contract No. 14r-10-232-40, we should take the value of the improvements as stated in an opening balance sheet which the plaintiff submitted to the Department of the Interior after the signing of the contract, then make a deduction for depreciation during the 5-year life of the contract. The resulting figure is given by the plaintiff in the petition as $149,834.54 and in his requested findings of fact as $118,619.11.
The opening balance sheet was submitted by the plaintiff under Section 8 of contract No. 14-10-232-40, which provided as follows:
Sec. 8. Opening Bala/rwe Sheet. The Concessioner shall submit for the approval of the Secretary [of the Interior] a balance sheet showing assets and liabilities pertaining to the operations hereunder as of the beginning of such operations, accompanied by a schedule describing the items sufficiently in detail to establish clearly their identity and respective values.
The plaintiff’s opening balance sheet contained figures indicating (among other things) that the 1954 value of the buildings and equipment at the lodges totaled $183,023.01.
The figure of $183,023.01 does not constitute a valid starting point for the computation of the book value of the plaintiff’s improvements at the expiration of contract No. 14^10-232-40. The plaintiff’s opening balance sheet, from which that figure is derived, was not approved by the Secretary of the Interior, as provided for in Section 8 of the contract. On the contrary, the document was expressly disapproved. *725 The plaintiff was asked to submit a revised balance sheet prepared on a proper basis, but he did not make another submission.
■The book value of property means the value as shown by the books of account of the person owning it. Webster’s New international dioitonary (2d ed., unabridged). At least some of the figures set out in the plaintiff’s opening balance sheet were not taken from the plaintiff’s books of account relating to the operation of the lodges. For example, the plaintiff obtained his figures relative to the 1954 value of the buildings at the lodges — totaling $139,000 — by: (1) estimating that it would have cost him $10 per square foot in 1954 to reproduce the buildings with new construction;[2] (2) taking the number of square feet in each building and multiplying the square footage by $10 in order to obtain the estimated 1954 replacement construction cost; (3) deducting 50 percent from the estimated 1954 replacement construction cost of the 36 buildings that had been constructed prior to 1940 in order to arrive at the estimated 1954 value of these buildings; and (4) deducting 25 percent from the estimated 1954 replacement construction cost of the 5 buildings that had been constructed in 1940 in order to arrive at the estimated 1954 value of such buildings. Hence, the total of $139,000 shown on the plaintiff’s opening balance sheet as representing the estimated 1954 value of the buildings had no relationship to the book value of the buildings, i.e., the value of the buildings as shown by the plaintiff’s books of account.
We do not have in the record direct evidence as to what the plaintiff’s books of account showed respecting the value of the plaintiff’s improvements at the expiration of contract No. 14^-10-232-40 on December 31, 1958. However, we do have secondary evidence that apparently is reliable. The plaintiff’s income tax returns for the several years comprising the life of contract No. 14-10-232-40 were offered by the Government and were admitted in evidence; and the plaintiff testified that the figures used in these returns with *726 respect to the value of the buildings and equipment at the lodges were based upon the valuation figures shown on his books of account. The plaintiff’s income tax return for the year 1958 showed that the original cost of the buildings and equipment at the lodges totaled $143,640.08; that the amounts written off as depreciation in prior years totaled $130,506.17; that the remaining value of the property at the beginning of 1958 totaled $13,133.91; and that the depreciation taken in 1958 totaled $2,870.22. Therefore, it can be deduced that the plaintiff’s books of account showed a remaining value of $10,263.69 for the buildings and equipment at the lodges upon the expiration of contract No. 14-10-232-40 at the close of December 31,1958.
The figure of $10,263.69 referred to in the last sentence of the preceding paragraph represents the book value of the plaintiff’s improvements within the meaning of that portion of paragraph (b) of Section 12 of contract No. 14-10-232-40 which declared that the plaintiff should receive compensation “for * * * [his] possessory interest in such improvements in an amount not less than their book value.” Although this provision of the contract, by plain implication, authorized the Secretary of the Interior to pay the plaintiff an amount greater than the book value of the improvements if the Secretary should deem a larger sum justifiable, there is nothing in the record to warrant the conclusion that the plaintiff would be entitled to an amount greater than the book value. Consequently, the Secretary was not legally obligated under this provision to pay the plaintiff an amount greater than the book value of the improvements.
Paragraph (b) of Section 12 of the contract, in addition to providing for the payment of compensation to the plaintiff for his possessory interest in the improvements at the lodges, also provided for the payment of compensation covering the costs incurred by the plaintiff in restoring the land to a natural condition, in transporting to a reasonable market for sale such movable property of the plaintiff as was made useless by the Secretary’s determination not to renew the plaintiff’s right to operate the lodges, and in removing or demolishing the plaintiff’s improvements (less salvage). However, the plaintiff has not presented any proof relative to expenditures for the accomplishment of these purposes.
*727 For the reasons previously indicated, it is my opinion that a judgment should be entered for the plaintiff in the amount of $10,263.69.
PINDINGS OP PACT
1. For a period of approximately 40 years, beginning about 1918 and extending through the year 1958, members of the plaintiff’s family operated Bear Lake Lodge and Fern Lake Lodge on the eastern slope of the Rocky Mountains in the State of Colorado, and within the boundaries of the Rocky Mountain National park. The two lodges were located about 5 miles apart. At first, the facilities at the lodges were quite simple, but in the course of time extensive improvements were made, so that each lodge ultimately consisted of a complex of buildings and equipment for the housing, feeding, and entertainment of the public. A total of 28 buildings, sufficient to accommodate 75 guests, were constructed at Bear Lake Lodge; and 13 buildings, sufficient to accommodate 35 guests, were constructed at Fern Lake Lodge. Some of the buildings were made of logs, others were of log-and-frame construction, others were of conventional frame construction throughout, and some were made of log slabs. (For the sake of convenience, Bear Lake Lodge and Fern Lake Lodge will usually be referred to hereafter in the findings as “the lodges.”)
2. The lodges were comfortable establishments. The buildings were well constructed, they were maintained in good condition, and they were comfortably furnished. Excellent food was served. However, the chief assets of the lodges were their settings amid beautiful scenery and the pervading atmosphere of remoteness from the world.
3. The buildings, etc., at the lodges were provided largely — perhaps wholly — at the expense of the plaintiff’s family,[3] but they were located on Government-owned lands with the consent of the Government (represented by the National Park Service, Department of the Interior, as the agency administering the Rocky Mountain National Park). *728 Contracts with the Government, covering successive terms within the 40-year period referred to in finding 1, defined the rights and obligations of the parties.
4. During the early part of the 40-year period mentioned in finding 1, the lodges were operated by the plaintiff’s mother and her then husband, who was the plaintiff’s stepfather. The plaintiff’s stepfather withdrew from the enterprise in 1926. Thereupon, the plaintiff’s mother took over the operation of the lodges, and the plaintiff, who was 18 years of age at the time, became her active assistant. Later, as the plaintiff and a brother attained maturity, the operation of the lodges became a partnership affair, with the plaintiff’s mother, his brother, and the plaintiff each having a one-third interest in the business. In 1942 or 1948, the plaintiff’s brother withdrew from active participation in the business, 'and sold his one-third interest in the partnership to the plaintiff’s mother and the plaintiff for $20,000. Thereafter, for approximately 10 years, the lodges were operated on a partnership basis by the plaintiff’s mother and the plaintiff, each owning a one-half interest in the enterprise.
5. (a) During the period from January 1,1949, until December 81, 1953, the lodges were operated under a contract that was numbered I-100np-129. The plaintiff’s mother, Mrs. Edna B. Bishop, signed the contract as the “Conces-sioner,” but, as indicated in finding 4, she was acting on behalf of herself and the plaintiff in signing the contract. The contract was signed on behalf of the Goverment by an Assistant Secretary of the Interior.
(b) The initial period covered by contract No. I-100np-129 was from January 1 to December 31,1949, but the term was extended to December 31, 1950, then to December 31, 1951, and finally to December 31,1953.
(c) One of the provisions of contract No. I-100np-129 was as follows:
15. Termination of Contract.
* * * * *
(b) If the Secretary shall determine that, upon the termination of this contract for any reason, except by forfeiture, it is desirable in the public interest to discontinue any or all of the operations authorized here *729 under, and/or to abandon, demolish, or remove any or all of the buildings, structures, or other improvements constructed or acquired by the Concessioner, other than by assignment from the Government, for use in connection with the operations authorized hereunder, the Secretary shall take such action as may be necessary to assure the Concessioner of compensation (1) for its interest in such buildings, structures, and other improvements in an amount not less than the original cost to the Concessioner of the properties so abandoned, demolished, or removed, less the depreciation charged by the Con-cessioner, less obsolescence and less any net salvage realized by the Concessioner, (2) for the cost of restoring the land to a natural condition, and (3) for the cost of transporting movable property of the Concessioner to a reasonable market for its sale. * * *
6. (a) On September 9, 1952, the plaintiff’s mother, Mrs. Edna B. Bishop, assigned to the plaintiff “all of her right, title, and interest in and to that certain agreement (Contract No. I-100np-129) as amended and extended through December 31, 1953, entered into between the Secretary of the Interior and said Mrs. Edna B. Bishop under date of May 20, 1949, covering the maintenance and operation of accommodations, facilities, and services for the public in Rocky Mountain National Park.” The plaintiff agreed to pay his mother, as consideration for the assignment of her one-half interest in the business, $3,000 per year out of the future profits from the operation of the lodges, if the annual profits, after the payment of taxes, should equal or exceed the figure indicated.
(b) The assignment referred to in paragraph (a) of this finding was approved by the Director of the National Park Service on November 14, 1952.
7. (a) Contract No. I-100np-129, as extended, expired at the close of December 31, 1953. It was not replaced by a new contract for more than a year, but the plaintiff continued to operate the lodges through the year 1954 as he and representatives of the National Park Service negotiated over the provisions of a new contract. For the purposes of the present litigation, the principal subject of the negotiations was the content of a proposed contract provision defining the rights and obligations of the parties if the Secretary *730 of the Interior should decide that it would be in the public interest for the operation of the lodges to be discontinued and for the sites to be restored to a natural condition.
(b) With respect to the point mentioned in the last sentence of paragraph (a) of this finding, the National Park Service prepared and submitted to the plaintiff a draft of a provision that was designated as paragraph (b) of Section 12 of the proposed contract. That paragraph stated in pertinent part as follows:
(b) If the Secretary shall determine that? during the term of this contract or upon its termination for any reason, it is desirable to discontinue the operations authorized hereunder, or any of them, and/or to abandon, remove, or demolish any of the Concessioner’s improvements, then the Secretary will, before making such determination effective, take such action as may be necessary to assure the Concessioner of compensation (1) for its possessory interest in such improvements in an amount not less than their book value * * *; (2) for the cost of restoring the land to a natural condition; (3) for the cost of transporting to a reasonable market for sale such movable property of the Concessioner as may be made useless by such determination; and (4) for the actual cost to the Concessioner of such removal or demolition, less salvage, resulting therefrom.
(c) The plaintiff objected to the draft of the proposed provision quoted in paragraph (b) of this finding. Over a period of months in 1954, the plaintiff insisted that the proposed provision be revised by substituting “sound value” for “book value” in the portion of item (1) that is quoted. Officials of the National Park Service in the field would not accept the change demanded by the plaintiff.
(d) In an effort to induce acceptance of the change that he was insisting upon, the plaintiff sent his attorney to Washington, D.C., for a conference with officials at the headquarters of the National Park Service. The conference was held on May 24,1954.
(e) Following the conference on May 24, 1954, an Assistant Director of the National Park Service wrote a letter dated June 1,1954, to the plaintiff’s attorney, stating in part as follows:
*731 * * * As explained to you, the change proposed by Mr. Bishop is not acceptable by us because (1) the Government could be called upon to pay more than the conces-sioner has expended if there should be an abandonment, removal, or demolition of any of the concessioner’s improvements, and (2) a more advantageous contract would be obtained by Mr. Bishop than we have granted dozens of other concessioners involving extremely size-able investments.
During the discussions here you requested that the term “book value’’ as used in Section 12(b) be explained to you and Mr. Bishop so that if this provision ever became effective it would be known what we mean by the term “book value.” In expired contract No. I-100np-129 with Mrs. Edna Bishop, Section 15(b) was somewhat analogous to Section 12(b) of the proposed new five-year contract. In the expired contract you will note that if the Secretary ever requires that the conces-sioner abandon, demolish, or remove any of its buildings or structures, the concessioner would be entitled to reimbursement “in an amount not less than the original cost to the Concessioner of the properties so abandoned, demolished, or removed, less the depreciation charged by the Concessioner, less obsolescence and less any net salvage realized by the Concessioner, (2) for the cost of restoring the land, to a natural condition, and (3) for the cost of transporting movable property of the Conces-sioner to a reasonable market for its sale.”
In view of the above-quoted provision and in order that there may be no material difference between the expired and the proposed new contract, we are willing to recognize under the proposed new contract the quoted definition as representing the book value Mr. Bishop would receive if the Secretary should ever require the abandonment, removal, or demolition of any of the con-cessioner’s improvement. On the other hand, if this clause should ever pome into play, we would have no objection to recognizing “book value” as that term is commonly used in sound accounting practices. In other words, either of these definitions would be satisfactory to us.
(e) By means of a letter dated June 10, 1954, the plaintiff’s attorney withdrew, in effect, the plaintiff’s previous insistence that the term “sound value” be substituted for the term “book value” in the pertinent portion of item (1) of paragraph (b) of Section 12 of the proposed contract.
*732 8. A new contract covering the operation of the lodges was entered into under the date of February 28, 1955, between the Government (acting through a contracting officer of the Department of the Interior) and the plaintiff, who was referred to in the various contract provisions as the “Con-cessioner.” The new contract was numbered 14-10-232-40. It provided in part as follows:
Seo. 1. Term of Contract. This contract shall be for and during the term of five (5) years from January 1, 1954, except as it may be terminated as herein provided. * * *
Seo. 2. Accommodations, Facilities, a/nd Services Authorized. The Secretary authorizes the Concessioner, during the term of this contract, to provide accommodations, facilities and services for the public within Rocky Mountain National Park at the Bear Lake Lodge and Fern Lake Lodge areas as follows:
(a) Lodging and cabin accommodations.
(b) Stands selling newspapers and periodicals, books, curios, souvenirs, ice cream, sandwiches, soft drinks, tobacco and other smokers’ supplies, and to rent or sell fishing tackle, fishing supplies, coats, sweaters, dusters, overcoats, etc.
(c) A saddle horse livery.
(d) A cocktail lounge selling beer, wine, mixed drinks, and liquors.
(e) The use of automotive equipment for transportation of supplies and employees, and for guests between Bear Lake Lodge and Estes Park, but not for sightseeing or pleasure trips.
* * # # *
Seo. 3. Plant, Personnel, and Bates, (a) The Con-cessioner shall maintain and operate the said accommodations, facilities and services to such extent and in such manner as the Secretary may deem satisfactory, and shall provide the plant, personnel, equipment, goods, and commodities necessary therefor, provided that the Concessioner shall not be required to make investments inconsistent with an opportunity to make a fair profit on the total of its operations hereunder.
(b) All rates and prices charged to the public by the Concessioner for accommodations, services, or goods furnished or sold hereunder shall be subject to regulation and approval by the Secretary, not inconsistent with an opportunity for the Concessioner to make a fair profit from the total of its operations hereunder. * * *
*733 Sec. Land, and Improvements, (a) The Secretary will assign for use by the Concessioner during the term of this contract, such pieces and parcels of land as may be, in his judgment, necessary and appropriate for the operations authorized hereunder.
(b) The Concessioner may construct or install upon the assigned lands such buildings, structures and other improvements as are necessary or desirable for the operations authorized hereunder, subject to the prior approval by the Secretary of the location, plans and specifications thereof, and the Secretary may prescribe the form' and contents of application for such approval. * * ‡ $
(e) “Government improvements” as used herein, means the buildings, structures, fixtures, equipment and other improvements upon the lands assigned hereunder, constructed or acquired by the Government and provided by the Government for the purposes of this contract.
(f)_ The Secretary hereby grants to the Concessioner the right to occupy and use such Government improvements during the term and subject to the conditions of this contract.
ifc * * * *
Seo. 5. Concessioner’s Improvements,. (a) “Conces-sioner’s improvements,” as used herein, means buildings, structures, fixtures, equipment and other improvements affixed to or resting upon the lands assigned hereunder in such manner as to be a part of the realty, provided by the Concessioner for the purposes of this contract, including (1) all such improvements upon the lands assigned at the date hereof, except Government improvements ; (2) all such improvements hereafter constructed upon or affixed to the lands assigned, by the Concessioner with the consent of the Secretary; and (3) all alterations, additions and improvements to Government improvements of the character normally considered capital additions by sound accounting practice, heretofore or hereafter constructed, installed or affixed by the Con-cessioner with the consent of the Secretary.
(b) It is the intention of the parties that the Con-cessioner shall have a possessory interest in all Conces-sioner’s improvements consisting of all incidents of ownership, except legal title which shall be vested in the United States. * * * The said possessory interest shall not be extinguished by the expiration or other termina *734 tion of this contract, and may not be terminated or taken for public use without just compensation. * * *
‡ $ $ $ $
Seo. 8. Opening Bala/nee Sheet. The Concessioner shall submit for the approval of the Secretary a balance sheet showing assets and liabilities pertaining to the operations hereunder as of the beginning of such operations, accompanied 'by a schedule describing the items sufficiently in detail to establish clearly their identity and respective values.
Sec. 9. Franchise Fee. The Concessioner shall pay to the Secretary within thirty (80) days after the 81st day of July of each year during the term of this contract a franchise fee for the privileges authorized herein the sum of Five Hundred Dollars ($500).
H* $ $ ‡ $
Sec. 12. Compensation for Concessioner's Possessory Interest.
•H
(b) If the Secretary shall determine that, during the term of this contract or upon its termination for any reason, it is desirable to discontinue the operations authorized hereunder, or any of them, and/or to abandon, remove, or demolish any of the Concessioner’s improvements, then the Secretary will, before making such determination effective, take such action as may be necessary to assure the Concessioner of compensation (1) for its possessory interest in such improvements in an amount not less than their book value * * *; (2) _ for the cost of restoring the land to a natural condition; (3) for the cost of transporting to a reasonable market for sale such movable property of the Concessioner as may be made useless by such determination; and (4) for the actual cost to the Concessioner of such removal or demolition, less salvage, resulting therefrom.
9. The plaintiff’s books of account relating to the operation of the lodges showed that, as of the beginning of the 1954-1958 period covered by contract No. 14-10-232-40, the original cost of the concessioner’s improvements totaled $142,446.91; that the portion of the original cost previously written off as depreciation totaled $116,565.12; and that the remaining value of the concessioner’s improvements totaled $25,881.79.
10. (a) Sometime in 1955, after the signing of contract No. 14-10-232-40 on February 28 of that year, the plaintiff *735 submitted to the National Park Service a document designated as an opening balance sheet (see Section 8 of the contract, as set out in finding 8). This document contained figures indicating (among other things) that the replacement construction cost of the concessioner’s 28 buildings at Bear Lake Lodge was $202,650 and the 1954 value of the buildings was $109,815; that the original cost of the concessioner’s equipment at Bear Lake Lodge was $49,039.71 and the 1954 value of the equipment was $38,691.78; that the replacement construction cost of the concessioner’s 13 buildings at Fern Lake Lodge was $58,470 and the 1954 value of the buildings was $29,185; that the original cost of the concessioner’s equipment at Fern Lake Lodge was $6,651.53 and the 1954 value of the equipment was $5,331.23; and that the current assets of the enterprise totaled $3,200.98.
(b) The figures relative to the buildings at the lodges, as set out in the document denominated an opening balance sheet by the plaintiff, were not derived from the plaintiff’s books of account relating to the operation of the lodges. Instead, the plaintiff obtained such figures by: (1) estimating that it would have cost him in 1954 $10 per square foot to reproduce the buildings with new construction; (2) tailing the number of square feet in each building and multiplying the square footage by $10 in order to obtain the estimated 1954 replacement construction cost; (3) deducting 50 percent from the estimated 1954 replacement construction cost of the 36 buildings that had been constructed prior to 1940 in order to arrive at the estimated 1954 value of these buildings; and (4) deducting 25 percent from the estimated 1954 replacement construction cost of the 5 buildings that had been constructed in 1940 in order to arrive at the estimated 1954 value of such buildings.
(c) The evidence in the record does not show the source of the figures used in the plaintiff’s opening balance sheet with respect to the equipment at the lodges and the current assets of the enterprise.
11. In a letter dated January 13, 1956, and addressed to the plaintiff, the acting superintendent of the Rocky Mountain National Park quoted as follows from a letter dated *736 December 20, 1955, from the chief auditor of the National Park Service:
We have reviewed the balance sheet of James Bishop as submitted in connection with Contract No. 14-10-232-40, purporting to be the financial condition of the enterprise as at January 1, 1953, ,[sic] the date of the beginning of the contract.
Mr. Bishop has valued the operating assets of the business in an amount that is $159,153.95 in excess of the costs of these assets, less depreciation. For our purposes, such a valuation is not acceptable. Therefore, _ Mr. Bishop should be instructed to resubmit his opening balance sheet as of January 1, 1953, [sic] and his annual report for 1954 and include therein only the actual costs of assets less depreciation based on the useful life of such assets.
Until such time as we receive an acceptable opening balance sheet and annual report, Mr. Bishop is in violation of his contract and he should be so informed.
12. Under the date of December 7, 1956, the Acting Director of the National Park Service wrote the following letter to the plaintiff:
The balance sheet submitted with your annual report for the year 1954, received April 4, 1955, purporting to report the opening balances of your concessions operations in Rocky Mountain National Park as of January 1, 1954 is not acceptable to the National Park Service and is disapproved. In this balance sheet the undepreciated fixed assets were valued at $183,025.01, an increase of $159,153.95 over the closing figures of December 31, 1953 and $42,588.83 more than the original cost of $140,436.18.
This balance sheet is improper since it contains a valuation of the fixed assets on an appraisal basis, which amount is considerably greater than that reported for the immediately preceding accounting period.
You are requested, under the provision of Section 8 of contract No. 1A-10-232-40 covering the period January 1, 1954 through December 31, 1958, to submit a revised balance sheet on the proper basis, at your earliest convenience.
13. The plaintiff did not submit a revised balance sheet, as requested in the concluding paragraph of the letter quoted in finding 12.
*737 14. Except for the disagreement between the parties with respect to the plaintiff’s opening balance sheet (see findings 10-13), the evidence warrants the inference that the plaintiff, during the life of contract No. 144L0-232-40, fully complied with the provisions of the contract.
15. Contract No. 14-10-232-40 remained in effect throughout the period referred to in Section 1 of the contract. It expired under its own terms at the close of December 31, 1958.
16. The plaintiff’s books of account relating to the operation of the lodges showed that, as of the close of the 195441958 period covered by contract No. 14410-232-40, the original cost of the concessioner’s improvements totaled $143,640.08; that the portion of the original cost written off as depreciation totaled $133,376.39; and that the remaining value of the concessioner’s improvements at the end of the 1954-1958 period totaled $10,263.69.
17. After the expiration of contract No. 14410-232-40 at the close of December 31, 1958, the Secretary of the Interior declined to renew the plaintiff’s right to operate the lodges. The Secretary had determined that it was desirable to discontinue such operations in their entirety and to abandon, remove, or demolish all of the concessioner’s improvements.
18. The evidence in the record fails to show the cost (if any) to the plaintiff of restoring the sites of the lodges to a natural condition, or of transporting to a reasonable market for sale such movable property of the plaintiff as was made useless by the failure of the Secretary of the Interior to renew the plaintiff’s right to operate the lodges, or of removing or demolishing the concessioner’s improvements (less salvage).
19. Because of the refusal of the Secretary of the Interior to renew his right to operate the lodges upon the expiration of contract No. 14-10-232-40, the plaintiff submitted to the Department of the Interior a claim for approximately $200,000. The claim was rejected. Thereafter, the present action to recover $411,664 was instituted by the plaintiff.[4]
*738 20. The defendant concedes in the present litigation that the plaintiff is entitled to recover $9,885.46 trnder paragraph (b) of Section 12 of contract No. 14-10-232-40.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover, and it is therefore adjudged and ordered that the plaintiff recover of and from the United States the sum of ten thousand two hundred sixty-three dollars and sixty-nine cents ($10,263.69).

 The plaintiff estimated, for this purpose, that It would have cost him $26.80 per square foot to reproduce the lodges with new construction in January 1959.

 The great variance between this estimated figure of $10 per square foot and the estimated figure of $26.80 per square foot referred to in footnote 1 is not explained in the record.

 Tliere is an implication in the record that some of the improvements may-have been provided at Government expense, but the evidence does not furnish any detailed information on this point.

 In his requested findings of fact, the plaintiff reduced the amount of the recovery sought to $406,288. This figure Is based upon the reproduction-cost-new of the lodges as of January 1959, as estimated by the plaintiff on the basis of $26.80 per square foot, less estimated depredation.