Per Curiam :
This case was referred to Chief Trial Commissioner Marion T. Bennett with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Buie 134(h). The commissioner has done so in an opinion and report filed on April 29, 1970. Plaintiffs filed exceptions to the commissioner’s findings, opinion and recommended conclusion of law. Defendant has urged that the court adopt the commissioner’s report and findings. The case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court agrees with the commissioner’s opinion, findings and recommended conclusion of law, it hereby adopts the same, as hereinafter set forth, as the basis for its judgment in this case. Therefore, it is concluded that plaintiffs are entitled to recover the sum of $10,371.80 on their petition, defendant is entitled to recover the sum of $310 on its counterclaim and, offsetting one recovery against the other, judgment is entered for plaintiffs in the sum of $10,061.80.
OPINION OP COMMISSIONER
Bennett, Chief Commissioner:
Plaintiffs, husband and wife, claim a breach of contract by defendant for the operation of a concession plaintiffs had, known as Olympic Hot Springs, in the Olympic National Park in the State of Washington. Plaintiffs seek to be compensated in the amount of $67,000 for the loss of their possessory interest in the improvements they made at the park site. Defendant admits liability only for the book value of plaintiffs’ possessory interest in the lesser sum of $10,371.80 and counterclaims for a $310 franchise fee remaining unpaid for the last year of plaintiffs’ operation of the concession.
The Olympic Hot Springs were discovered in 1907 by the father of plaintiff Mrs. Schoeffel, and he promptly commenced their commercial development under a Forest Service permit. After the area was included in the Olympic Na *927 tional Park in 1940, permission to operate a concession was periodically granted by the National Park Service, Department of Interior. Plaintiffs have been the sole operators since 1950.
The springs are located in a deep forest, in a steep ravine. They have a high mineral and sulphur content and originally were believed to have medicinal value. They formerly attracted wide interest and patronage. Plaintiffs and their predecessors in the operation built some attractive, rustic accommodations for the public, consisting of a hotel (which burned), 24 cabins and accessory improvements, and a fine, large, modem, concrete swimming and wading pool and adequate bathhouses.
The first contract with the National Park Service was entered into in 1941 for a 15-year term, expiring on December 31,1955. In 1954 plaintiffs were told by defendant that the Public Health Service had determined that the untreated hot spring water in the pool did not meet required health and sanitation standards and that the necessary conversion would be expensive. Plaintiffs were told that if they could not accomplish the conversion their contract would not be renewed. In August 1955 plaintiffs were given a long list of additional complaints by defendant attesting to their unsatisfactory operation and maintenance of the concession facilities. Plaintiffs were advised that while defendant desired to continue the concession the desire was for someone else to do it, but that unless the pool conversion was accomplished no sale or transfer of plaintiffs’ improvements to a successor concessionaire would be approved.
Plaintiffs had been reluctant to make substantial capital improvements without the assurance of a recapture of their investment which another long-term lease would provide. They appealed the adverse decision, with the assistance of legal counsel, to a higher authority within the Department of Interior and won an extension of the contract for the year 1956. Another 1-year extension was later granted for the year 1957. Plaintiffs were prohibited by defendant from making capital improvements during these 2 years. This restriction *928 was lifted when on September 13, 1957, tbe parties entered into a new contract for a term of 5 years, cowering tlie period January 1, 1958 through December 31,1962.
As an inducement to plaintiffs to make the investment required in the pool conversion, and other improvements, the 1957 contract preamble and section 5 stated, in part:
Whereas, the establishment and maintenance of such facilities and services involve a substantial investment of capital and the assumption of the risk of operating loss, and it is therefore proper, in consideration of the obligations assumed hereunder and as an inducement to capital, that the Concessioner be given assurance of security of such investment and of a reasonable opportunity to make a fair profit; and
Whereas, it is the intention of the parties that any acts, policies, or decisions of the Secretary under this contract will be consistent with reasonable protection to the Concessioner against loss of his investment and against substantial increase in costs, hazards, and difficulties of his operations hereunder:
Now, Therefore, * * * the said parties, in consideration of the mutual promises herein expressed, covenant and agree to and with each other as follows:
* * * * *
Seo. 5. Concessioner’s Improvements, (a) “Conces-sioner’s Improvements,” as used herein, means buildings, structures, fixtures, equipment, and other improvements, affixed to or resting upon the lands assigned hereunder in such manner as to be a part of the realty, provided by the Concessioner for the purpose of this contract,
(b) It is the intention of the parties that the Conces-sioner shall have a possessory interest in all concessioner’s improvements consisting of all incidents of ownership, except legal title which shall be vested in the United States. * * *. The said possessory interest shall not be extinguished by the expiration or other termination of this contract, and may not be terminated or taken for public use without just compensation. * * *
Section 12 of the detailed 23-page contract discussed compensation for the concessionaire’s possessory interest in circumstances where for any reason the concessionaire would cease to be authorized to conduct operations and thereafter *929 such, operations would be conducted by a successor or by an agency of the Government, a situation which does not obtain under the facts of this case. However, for contrast and emphasis, it may be helpful to note that in such a situation the successor concessionaire was to purchase plaintiffs’ pos-sessory interest, paying “the fair value thereof” which “shall be deemed to be the sound value of the improvement to which it relates at the time of transfer of such possessory interest, without regard to the term of the contract. Merchandise and supplies shall be valued at replacement cost including transportation. Equipment shall be valued at replacement cost less depreciation and obsolescence.” It was agreed that if the concessionaire and proposed purchaser could not agree upon fair value it would be determined by arbitration. The contract did not discuss how the “just compensation” mentioned in section 5 (b) would be determined in event of the termination or taking there mentioned. Section 11 of the contract provided for termination in case of substantial default. There were no specific sections titled as to either expiration or taking.
By amendment, the 1957 contract extended plaintiffs’ time within which to complete conversion of the pool, which had proved to be most troublesome and expensive. This work was completed at a cost to plaintiffs of $33,800. They financed the cost by borrowing. Plaintiffs were rather strapped financially by this cost and unable and unwilling to go further in debt or to make additional capital improvements, such as building much-needed additional cabins to increase their income, without assurance of a long-term contract which they solicited. They desired a 20-year contract. Defendant, however, was still dissatisfied with the quality of their operation of the concession, was continually threatening to shut it down, and observed with concern the fact that it had been operating at a loss for several years and that plaintiffs were approaching old age, which, in defendant’s judgment, impaired their ability to operate in such a way as to meet defendant’s standards for a park concession.
On May 24,1963, the parties agreed to a new contract for 2 years covering the period January 1,1963 through Decern- *930 ber 31,1964. It was similar to the 1957 contract in pertinent respects. Defendant would not approve major capital improvements during the short life of this contract, even had plaintiffs been disposed to make them.
An audit by defendant of plaintiffs’ books and records, made in 1963, covering the years 1960,1961, and 1962, caused the auditor to observe that the contracts with plaintiffs did not contain what he described as standard contract language for park concessions and providing that “possessory interest,” if paid for by defendant, would be at book values. He stated that this could be to defendant’s potential disadvantage and recommended to defendant that its obligations for compensating for plaintiffs’ possessory interest, in event of discontinuance of the concession, be determined. This led to a change in the language of the next contract which has given rise to this lawsuit.
On May 5,1965, a new contract, No. 14-10-0434-1733, was entered into by plaintiffs and defendant for the 1965 and 1966 calendar years. This contract was similar in most respects to the 1957 and 1963 contracts but there were additions to sections 5 (b) and 12(a). One new sentence was added at the end of section 5 (b), which was quoted above. This sentence read:
* * * Performance of the obligations assumed by the Secretary under Section 12 herein shall constitute just compensation in the circumstances therein described.
The pertinent language added to section 12 of the 1965 contract was as follows:
Sec. 12(a) (2) If the Secretary shall determine that, during the term of this contract or upon its termination for any reason, it is desirable to discontinue the operations authorized hereunder, or any of them, and/or to abandon, remove, or demolish any of the Concessioners’ improvements, then the Secretary will, before making such determination effective, take such action as may be necessary to assure the Concessioners of compensation [1] for their possessory interest in such improvements in the amount of their book value, * * *.
(3) Payment of the compensation provided for in this section will terminate the Concessioners’ possessory interest in the improvements to which it relates and will *931 constitute just compensation for the termination or taking of such possessory interest.
The 1965 contract was the last one between the parties in this case. During 1966, the final year of plaintiffs’ operation of the concession, defendant decided for a variety of reasons not contested here, to shut the concession down by not entering into any more contracts for its operation. Plaintiffs were advised of this decision 'by defendant on August 22, 1966. There is no evidence that they appealed the decision. In summary, defendant wanted to return the area to its natural condition, considered the terrain unsuitable for a resort, was still not satisfied with the effectiveness of the conversion of the pool to meet health, sanitation, and safety requirements, and was convinced that for several perhaps valid reasons, such as advancing age, plaintiffs were no longer capable of operating an efficient concession in the public interest. Plaintiffs, of course, had received many warnings from the Park Service and the record is replete with defendant’s repeated complaints and threats to put an end to the operation since 1954.
Plaintiffs have several theories for recovery in this case. Principally, they revolve around plaintiffs’ complaint that the 1965 contract, as construed by defendant, would deprive them of just compensation for their possessory interest in improvements as promised by the 1957 and 1963 contracts. The limitation of just compensation to book value in the 1965 contract, they say, is inconsistent with just compensation as promised earlier and creates an ambiguity which should be resolved against defendant as drafter of the contracts. They say also that circumstances surrounding the execution of the 1957 contract, which induced them to make a substantial capital improvement in the swimming pool and assured them against a loss of this investment, create an equitable estoppel to denial of just compensation from defendant, the compensation to be measured by appraised value. Additionally, plaintiffs assert that the language about book value inserted in the 1965 contract unilaterally by defendant may have been a mutual mistake which is a basis for reformation. If it was a negligent unilateral mistake by plaintiffs, on the other *932 hand, they say it was induced by defendant, that they would not have agreed to it if they had read or understood the 1965 contract, and that this is sufficient ground for reformation or rescission. Finally, plaintiffs say that they cannot be held to have waived their rights to just compensation under the earlier contracts because there was no consideration for so doing.
Defendant denies the foregoing allegations but agrees that plaintiff’s possessory interest cannot be extinguished. It differs only on what payment for that interest should be. Defendant also agrees that the 1965 contract language is different from the earlier language, but says that the earlier language had to be clarified because section 5 (b) of the 1957 and 1963 contracts, quoted above, promised just compensation only for a termination or taking, did not say how it would be determined, and did not say what would happen in event of an expiration. This was cleared up by the additions to sections 5 (b) and 12(a) of the 1965 contract limiting just compensation to book value for expiration, termination, or taking.
The evidence supports the conclusion that both parties were quite interested in the continuation of the concession in 1957 despite prior difficulties and that the 5-year term of this contract, 1958-62, was an inducement to plaintiffs to make a big capital improvement they would not have made but for the guaranteed opportunity to amortize it over a period of years. By 1963, however, and in 1965, defendant had about lost faith that plaintiffs could operate the concession satisfactorily, and in 1966 decided that it would be best to close it and let the site revert to nature. Hence the short-term contracts. In these latter years, the eagerness to continue was manifested by plaintiffs. In 1965 Mrs. Schoeffel appeared at the local park headquarters on several occasions to see if a new contract had arrived from Washington, D.C., where they were drafted at the national headquarters of the Park Service, Department of the Interior. There was no negotiation. Plaintiffs testified they knew from experience that, if they didn’t accept what was offered, it would take so long to get another draft of a contract that they might lose the *933 1965 summer season altogether. The seasons in the park are brief, only about 3 months of the year because of heavy snows. Plaintiffs had been engaged in the operation of Olympic Hot Springs for most of their adult lives. They were approaching their 70’s, which is a little late for anyone to start anew in another business. Their eagerness to continue under almost any circumstances would be understandable as long as their possessory interest was secure.
Finally, in early March 1965, a contract arrived at the park headquarters. Mrs. Schoeffel picked it up and took it home without reading it. Plaintiffs retained possession of the contract until May 5,1965, when they returned with it to park headquarters in Port Angeles, Washington. What happened on this occasion is clearly established by the evidence. The park superintendent, newly arrived on the job, asked plaintiffs if they had any questions about the contract. They said they had none, and signed it. The park superintendent on the day of the signing saw the reference in the contract to book value as the measure of just compensation for possessory interest but he said nothing about it. He considered it to be standard language for concession contracts and was aware that plaintiffs had possession of the contract for over a month and a half. Pie was not familiar with the language of plaintiffs’ earlier contracts. Plaintiffs, however, who did not discuss the contract or read it at the time of the signing, now say that they never read it at any time before signing during the long period that they had possession of it. They deny that they consulted counsel in this interval, although they were not unfamiliar with legal counsel, having successfully employed such services in connection with their appeal in 1955, and being represented by well-qualified counsel in this case.
Why did plaintiffs obtain the copy and keep it for so long unless they wanted to examine it? It can fairly be said that they were eager to get a copy to learn if they were going to be extended the opportunity to operate for another year or two. But, having learned this when the copy was exhibited at park headquarters, that part of the question was answered. Yet, Mrs. Schoeffel took it back with her to Olympic Hot *934 Springs. This was a cautious and reasonable thing to do. Her husband had not seen it. The matter needed to be discussed and the document examined. Why else? It puts too much of a strain on credulity to believe that plaintiffs did not examine the contract between mid-March and May 5. It is more reasonable to believe that they are mistaken in their memory about this and that they looked at the contract and were satisfied with the changes, for when they signed it, they did so without asking questions. Defendant had no reason to believe plaintiffs did not understand the contract. Plaintiffs testified to limited educations but impressed the commissioner with their intelligence and knowledge of their prior contractual arrangements and operation of the resort in which they had been engaged for so many years.
Defendant, as represented by its authorized contract drafters in Washington, D.C., knew exactly what it was doing and its 1965 contract language is not ambiguous. There is no mutual mistake here which might justify reformation or rescission. Maland v. Houston Fire & Cas. Ins. Co., 274 F. 2d 299 (9th Cir. 1960); Restatement, Contracts § 508 (1932). Plaintiffs’ negligent unilateral mistake, if there was one, is not sufficient to rescind the contract where for 2 years they have uncomplainingly enjoyed the consideration they sought in the contract, namely, the concessionary use of the hot springs for the years 1965-66. Grauer v. Schenley Products Co., 32 F. Supp. 225, 228 (S.D.N.Y. 1940); 5 Williston, Contracts § 1578 (rev. ed. 1937); 76 C.J.S. Reformation of Instruments § 32 (1952).
When a detailed contract is executed by the parties, it will be presumed to represent their complete undertakings and is conclusive and in derogation of any prior understandings not included within the instrument itself. Under this rule the earlier contracts cannot modify the last one which was valid and stands on its own feet. Willems Indus., Inc. v. United States, 155 Ct. Cl. 360, 369, 295 F. 2d 822, 827 (1961), cert. denied, 370 U.S. 903 (1962). Plaintiffs have cited no authority which excuses a party from a contract because he has not read it before signing and accepting its benefits. Assuming that plaintiffs did not read the contract, this is really no *935 excuse for saying that they did not know what it contained when they are not illiterate. 17 C.J.S. Contracts §§ 41g, 141 (1963). Any other rule would throw chaos into all contract arrangements because a party could avoid responsibility thereunder at his convenience simply by saying that he had signed the contract without reading it. The law is well settled in the State of Washington that failure to read a contract provides no defense against enforcement of its provisions where the mistake sought to be avoided is unilateral and could have been detected by the simple, prudent act of reading the contract. Indeed, as the Supreme Court of Washington said in Hayes v. Automobile Ins. Exch., 126 Wash. 487, 218 P. 252 (1923): “Whether he read it or not is immaterial. It was his duty to read it, and the law says that he did read it.” Also see Perry v. Continental Ins. Co., 178 Wash. 24, 33 P. 2d 661 (1934).
Finally, reference must be made to plaintiffs’ allegations that had they not signed the 1965 contract they would have been entitled to “just compensation” under the 1957 and 1963 contracts instead of to “book value” under the 1965 contract, and that the evidence shows the former is a lot more money than the latter. They say defendant is equitably estopped from not paying “just compensation” because defendant induced plaintiffs to spend large sums for the pool conversion on assurance of such compensation.
Eagerness of plaintiffs to get and to sign another contract in 1965, even without reading it, if this is to be believed, and their acceptance of its benefits for 2 years, are sufficient reasons to rebut the claim that the contract is void and that the defendant is estopped from having the earlier ones govern this case. But, the assumption that just compensation would necessarily be more than book value in this case is a mirage which leads plaintiffs to disappointment. What would constitute just compensation in event of termination or taking if the 1957 and 1963 contracts were not renewed is not set forth therein, a very good reason for doing so when the contract was redrafted in 1965 as defendant’s auditor had suggested. Just compensation is a broad term generally understood to mean market value at the time and place of tak *936 ing. But there was no taking here in the classic sense of the word, and plaintiffs still own the possessory interest in their improvements at Olympic Hot Springs. They lost the right to operate the concession but nothing that they owned was taken. There is no compensable property right in the qualified opportunity to operate a concession on Government lands. This opportunity is a risk assumed by the concessionaire who knows that it may not be renewed. Plaintiffs certainly had ample warnings of this possibility since 1954, and it was a contingency covered by the contract language. The 1965 contract just expired and no other was made. It provided that just compensation in such event would be measured by the book value of plaintiffs’ improvements. The case falls within the rule of Bishop v. United States, 164 Ct. Cl. 717 (1964), where a similar question was resolved against plaintiff who had a concession in Eocky Mountain National Park.
Plaintiffs’ position apparently is that just compensation can only be one of three things: market price, capitalized profits, or reproduction cost depreciated. The latter is relied on here since there was no market and there were no sales for comparative purposes and for several years there had been no net profit to capitalize. Eeproduction cost depreciated is used as a test of just compensation only where no other basis of valuation is available. Bishop v. United States, supra. It is generally unsatisfactory because it usually results in too high a valuation, or it cannot be shown that someone would have reproduced the property, or that it could have been reproduced, or that there is any correlation between what a willing buyer would actually pay for the property if reproduced. These problems are insurmountable here. Plainly, there could have been no buyer because the defendant would not permit the concession to be operated by anyone, even assuming a willing buyer might have thought he could make a profit where plaintiffs did not. So, nobody would have reproduced the property or improved or operated it. The test is impracticable of application under the facts of this case.
*937 But, are plaintiffs being denied just compensation because it is measured by book value? I think not. Just compensation in a case where there is no taking may simply mean a fair deal. Plaintiffs will be made whole by payment of book value and it is just compensation here, in the broad sense, because they have enjoyed the tax advantages of depreciation pursuant to which they have written off their whole investment for tax purposes except for what book value remains. This is illustrated by an exhibit of plaintiffs, the final annual financial report for the calendar year 1966, certified as correct by the signature of Mr. Schoeffel. But for the large depreciation taken annually, plaintiffs would have had a net profit subject to income tax in some of the years in which they claim a net operating loss. So, if plaintiffs are now paid the remaining book value which is not depreciated, are they not made whole ? There is no valuable asset left on which a dollar value can be set, whether called just compensation or by any other name. All of the recent contracts held out to plaintiffs the inducement of “reasonable protection to the Concessioner against loss of his investment * * No loss has been established which will not be compensated for by payment to plaintiffs of the remaining undepreciated book value of their possessory interest in the investment, which is $10,371.80. Defendant has not breached the contract.
Defendant has counterclaimed for the unpaid franchise fee of $310 provided for in section 9 of the 1965 contract. Defendant is entitled to judgment for this sum.
FINDINGS of Fact
1. Plaintiffs are citizens of the United States residing near Port Angeles, Washington, and are husband and wife. Since the death of Mrs. Schoeffel’s father, William Everett, in 1950, until December 31, 1966, plaintiffs have been sole operators and owners of a possessory interest in a recreational facility located in the Olympic National Park in the State of Washington. The facility was known as Olympic Hot Springs.
2. Members of plaintiffs’ families have been involved in the operation of the facility from its beginning soon after *938 discovery of the hot springs by William Everett on June 27, 1907. Mr. Schoeffel has been connected with the enterprise since 1924. He is a cabinetmaker by trade and has a grade school education. Mrs. Schoeffel has 2 years of high school education.
3. Development of the site commenced in 1908. The springs, which have a high mineral and sulphur content, are located in a deep ravine several miles southwest of Port Angeles, Washington, on Boulder Creek, at an elevation of 2,100 feet. At the time of discovery the site could be reached only by pack trail through virgin forest. However, by 1909 the original partners of Mr. Everett had cooperated with him in improving the trail and in constructing a cabin or cookhouse, some living quarters, a bathhouse, toilet house, and wooden tubs for bathing in the mineralized hot spring water. A swimming pool was first dug in the ground. Later a pool was built of lumber. Eventually there was a hotel of 20 bedrooms, which burned in 1940 and was not replaced. Guest cabins with toilets were later built, 24 in number. A two-story building was built which housed a kitchen and dining room for 50 people. Plumbing and retaining walls were installed. A modern concrete swimming and wading pool, 41 x 133 feet in size, and surrounding bathhouses were also installed. The area is subject to heavy snows and the recreational season was only about 3 months of the year. Construction of a public road in 1930 facilitated development. Parking areas were built, and a diesel engine was eventually installed to operate a generator previously powered by a water wheel on Boulder Creek in the ravine below plaintiffs’ improvements.
4. Since the land area in question was owned by the United States the concession thereon was originally by Special Use Permit of the Forest Service for a minimal fee. The Olympic National Park was established in 1938 and extended in 1940 to include the area of the hot springs of concern here. Thereafter a permit was issued by the National Park Service, Department of Interior, and plaintiffs had contracts with defendant. A Miscellaneous Service Permit, approved June 15, 1940, was issued to plaintiffs by defendant for a term of 1 year from January 1,1940 to December 31,1940. Plaintiffs *939 paid the sum of $155 for the permit and agreed to the conditions therein. The permit described an area of 10.96 acres and stated that under the terms thereof plaintiffs were to carry on the business of operating a resort and to maintain certain cabins, a hotel, and other structures.
5. On May 13, 1941, a contract, No. I-lp-17915, was entered into by defendant, acting through the Secretary of the Interior, and the Olympic Hot Springs Company, by plaintiff Harry S. Schoeffel, covering a term of 15 years from January 1, 1941 to December 31, 1955, for operation by the company of the facilities at the site for the accommodation of the public, subject to requirements as laid down by defendant. The operator of the concession contracted to pay to defendant certain charges as set forth in a schedule in the contract. Article VI of the contract provided that, upon its expiration, if the premises should be leased to someone else, then the operator should be reimbursed for the “reasonable value” of its improvements by the new lessee. The value was to be fixed by the Secretary or by a board of three appraisers. Upon dissolution of the Olympic Hot Springs Company, Inc., in 1943, the contract was assigned in 1945 to plaintiffs and to William Everett with approval of the defendant.
6. During the 15-year period that the 1941 contract was in force, the parties discussed plans for expansion and improvement of the facilities erected by the plaintiffs. In 1942 a proposed master plan was drawn by defendant for the Olympic Hot Springs area. In order to increase income, plaintiffs desired to build some new cabins. Both parties desired that certain cabins, 12 in number (half of the total), be replaced also, because their location put them in danger from falling trees on the steep slope where the cabins were located. Defendant approved removal of these cabins and of certain trees and this work was performed between 1952 and 1954. The proposed new cabins which would have cost approximately $60,000 were not built. Plaintiffs did not wish to make such a large expenditure without a long-term contract renewal. Further, plaintiffs learned that they were required by defendant to spend considerable sums for improvement of the swimming pool.
*940 7. In the spring of 1954, defendant advised plaintiffs that the Public Health Service had concluded that the swimming pool did not meet health and sanitation standards because of the use of untreated mineral water therein. Correction of ■the condition was required by either chemical treatment of the water or the use of a heat exchanger. Defendant said that the cost of the conversion would be rather high. Plaintiffs were instructed to submit a plan for correction of conditions and to have the same in operation, if approved, in time for the 1956 season. Plaintiffs were further instructed to advise defendant of their financial ability to undertake the required program. Defendant also told plaintiffs that failure to pursue the improvement work would result in their contract not being renewed 'beyond the December 31,1955 expiration date.
8. Plaintiffs received a letter under date of August 8,1955, from Fred J. Overly, superintendent of the Olympic National Park, advising that their operation of the concession was considered unsatisfactory. The letter contained a long list of complaints against plaintiffs, including the following: Plaintiffs were said to have obtained the long-term contract upon representations that it would justify a loan for reconstruction of the hotel which burned in 1940, but that it had not been rebuilt and existing overnight facilities had been permitted to deteriorate and to decrease in number without replacement; the premises had not been kept neat and orderly; visitoi’s using the facilities had not been properly supervised, and some had lost their lives in the pool; accidents and law violations had not been reported; an audit of plaintiffs’ accounts disclosed irregular financial practices and sums due and unpaid to defendant; safety and fire requirements had not been met; plaintiffs had failed to reply to communications from the Park Service; and plaintiffs had failed to submit plans, as ordered, for conversion of the pool as required by the Public Health Service standards. Plaintiffs were advised that defendant desired to continue the concession with someone else but that no one else would be permitted to succeed plaintiffs or to acquire their improvements *941 until and unless the pool met the Public Health Service sanitary requirements.
9. With the assistance of legal counsel, plaintiffs appealed this adverse decision, and the Associate Regional Director of the Park Service, for the Director of the Service, on July 6, 1956, gave them a 1-year extension of the contract to December 31, 1956. Plaintiffs had sought another contract for a term of 15 or 20 years.
10. On June 6, 1957, plaintiffs and defendant agreed to another 1-year extension of the concession contract for the period covering January 1,1957 through December 31,1957. The extension agreement executed by the parties recited that a prospectus had been issued on February 18, 1957, calling for offers to acquire, operate and rehabilitate the existing facilities and to provide certain new facilities at Olympic Hot Springs, but that no acceptable offer had been received and defendant desired that plaintiffs continue to operate the concession through the 1957 season. During the contract extensions for 1956-57, plaintiffs were prohibited by defendant from making any capital improvements.
H. The restriction against capital improvements referred to above was lifted by defendant on September 13,1957, the date on which the parties entered into a new contract, No. 14r-10-447-367, for a term of 5 years, covering the period January 1,1958 through December 31,1962.
12. At the time, plaintiffs were aware that other persons operating concessions in Olympic National Park were gradually being removed therefrom. Plaintiffs were concerned about their opportunity to continue their concession and concerned about their ability to amortize the heavy investment defendant was insisting upon for improvement of the pool and other concession facilities. Defendant, for its part, was insistent that the swimming pool meet the sanitary requirements and provided in the new contract that the pool conversion be completed by July 1,1958, or within such extended time as defendant might approve. As an inducement to plaintiffs and in recognition of the requirement that plaintiffs make a substantial capital investment in improvement of the pool, and in further recognition of plaintiffs’ concern about *942 the security of such investment, the contract provided that while defendant was to have final authority as to the manner of plaintiffs’ operation of the concession and was to approve all rates charged to the public—
* * * the Concessioner shall not be required to make investments inconsistent with an opportunity to make a fair profit * * *.
Sec. 3(b) (1) * * * In determining fair profit for this purpose, consideration shall be given to the rate of return required to encourage the investment of private capital and to justify the risk assumed or the hazard attaching to the enterprise; * * *.
13. Section 5 (b) of the contract expiring on December 31, 1962, provided:
It is the intention of the parties that the Concessioner shall have a possessory interest in all concessioner’s improvements consisting of all incidents of ownership, except legal title which shall be vested in the United States. However, such possessory interest shall not be construed to include or imply any authority, privilege, or right to operate or engage in any business or other activity and shall, in its exercise and enjoyment, be wholly subject to the other applicable provisions of this contract and to the laws and regulations relating to the Park. The said possessory interest shall not be extinguished by the expiration or other termination of this contract, and may not be terminated or taken for public use without just compensation. Whenever used in this contract, “possessory interest” shall mean the interest described in this paragraph.
14. Amendment No. 1 to concession contract No. 14-10-44Y-367 was entered into by the parties on May 14, 1958, and extended from July 1,1958 to December 1,1958, plaintiffs’ obligation to complete the improvements to the swimming pool. The extension was necessitated by new health regulations adopted by the Washington State Board of Health and endorsed by the Public Health Service of the United States Department of Health, Education and Welfare. The improvements were duly completed at a cost to plaintiffs of $33,800. Plaintiffs financed the work by borrowing from a bank, from a relative, and on their life insurance *943 policies. Plaintiffs bad tried unsuccessfully to chlorinate the warm sulphur water. Defendant ultimately required fresh water to be used in both the swimming and wading pools.
15. Plaintiffs’ financial condition did not permit them, after the pool conversion, to add the additional cabins they wished to build to increase their income, unless they could get a long-term contract for operation of their concession. They desired a 20-year contract. Defendant was unwilling to grant a long-term contract, being dissatisfied with the quality of plaintiffs’ operation of the concession and recognizing that they were approaching an age which made it increasingly less likely that they would be physically able to maintain the concession to defendant’s standards or to fulfill a long-term contract.[1] The concession had been operating at a loss for several years.
16. On May 24, 1963, the parties agreed to a contract, No. 14-10-0447-587, for 2 years covering the period January 1, 1968 through December 31, 1964. This contract was similar in most of its essential terms to the one immediately preceding. Section 5 (b) of the 1957 contract quoted in finding 13 was different in the 1963 contract only in the last sentence thereof which appears to reflect a typographical error not changing the meaning. No major capital improvements were made or could be made with defendant’s approval during the life of this contract, although not explicitly so stated in the language thereof.
17. Under date of July 23,1963, defendant made an audit report of plaintiffs’ operation at the Olympic Hot Springs, covering the period January 1, 1960 to December 31, 1962. Defendant’s auditor from the Department of Interior, National Park Service, commented in the report as to section 12 of the 1963 contract for compensating the concessionaires for their possessory interest in the improvements in event the Secretary determined that the operations be discontinued. It was stated that this contract, expiring December 31,1964, *944 did not contain the standard contract language providing that the concessionaires be compensated for book values. It was pointed out that section 5 (b) stated that the possessory interest may not be “terminated or taken for public use without just compensation.” The auditor said:
* * * Therefore, the omission from Section 12 as discussed above means to have removed “book value” from consideration as a basis for determining “just” compensation. If this is true, then the matter of determining “just” compensation is open to conditions possibly less favorable to the Government, such as compensation based upon appraisal or otherwise.
Defendant’s auditor recommended that, because of the possibility that the concession operation might be continued or discontinued, depending on future developments, the defendant’s contractual obligations for compensating for the plaintiffs’ possessory interest be determined.
18. Plaintiff Mrs. Schoeffel appeared at the park headquarters in Port Angeles on several occasions to find out if a new contract for 1965 or subsequent years had arrived. The contracts are prepared by defendant in "Washington, D.C., and mailed to the park headquarters in Port Angeles for submission to concessionaires without negotiation. On or about the middle of March 1965 a new contract did arrive. In the absence of the superintendent of the Olympic National Park, a copy of the contract was handed to Mrs. Schoeffel by a park employee. She did not read it at the time but did notice that a map was attached. Upon inquiry of the person who had handed her the contract she was advised that the map demonstrated the location of the property. There was no further discussion of the contents of the document. She took the copy with her.
19. On May 5, 1965, both plaintiffs appeared at the park headquarters in Port Angeles and signed the contract which they brought with them — the same one Mrs. Schoeffel had obtained in March. This contract, No. 14-10-0434-1733, covered the period January 1, 1965 through December 31, 1966. This was the final agreement between the parties, although there is no evidence that they knew it at the time.
*945 20. At the time of the signing of the 1965 contract the park superintendent had newly arrived and was unfamiliar with the provisions of plaintiffs’ prior contracts. He read the new contract for the first time on May 5,1965. He observed that section 12 of the contract provided that in event of termination or discontinuance of the contract the concessionaires were to receive just compensation for their possessory interest in the improvements and that this compensation was defined as “book value.” He considered that the contract contained standard language. He testified that had he known the contract differed from prior ones in its definition of just compensation, he was not sure he would have mentioned it to plaintiffs because they had possession of a copy of it for some time and had an opportunity to review it and consult with counsel. Plaintiffs denied they had read it or consulted counsel. They did not read it or discuss it at the time of the signing. The superintendent did ask plaintiffs if they had any questions about the contract. They said they had no questions, and then signed it. Plaintiffs’ acceptance of the contract was motivated, in part, by their belief that if they did not sign they would not get the opportunity to execute another contract in time to cover the 1965 summer operating season. This belief was based on their experience with delays in obtaining prior contracts.
21. The 1957,1963, and 1965 contracts were similar in most respects significant here. They were prepared by defendant in Washington, D.C.; they stated that as an inducement to capital that the concessionaires were to have assurance of security of their investment and of a reasonable opportunity to make a fair profit (Introduction, pp. 1-2) ; they authorized the furnishing of similar accommodations and services in a manner deemed satisfactory to defendant (§2(b)); the concessionaires would not be required to make investments inconsistent with an opportunity to make a fair profit on the total of their operations (§ 3); in determining fair profit, consideration would be given to the rate of return required to encourage the investment of private capital and to justify the risk assumed, and other significant factors (§3(>b) (1)); accounting records were required to be maintained and were *946 subject to audit (§ 7); the annual franchise fees for the three contracts were $100, $404, and $310, respectively (§ 9); and defendant was authorized to terminate the contracts for substantial default or continued unsatisfactory performance, without, however, impairing the possessory interest of concessionaires in their improvements (§11).
22. Section 5(b) of the 1965 contract differed somewhat from similar sections of the 1957 contract quoted in finding 13 and the 1963 contract (finding 16). The last sentence of this section in the 1965 contract said:
Performance of the obligations assumed by the Secretary under Section 12 herein shall constitute just compensation in the circumstances therein described.
23. Section 12 of the three contracts was entitled “Compensation for Concessioners’ Possessory Interest.” Paragraph (a) (1) dealt with the circumstance under which operations were to be conducted by a successor concessionaire, not in issue here. The 1963 contract reflects an apparently inadvertent omission of part of the language of this subpara-graph. The 1965 contract, however, added two additional subparagraphs not appearing in the 1957 and 1963 versions, as follows:
■Sec. 12(a) (2) If the Secretary shall determine that, during the term of this contract or upon its termination for any reason, it is desirable to discontinue the operations authorized hereunder, or any of them, and/or to abandon, remove, or demolish any of the Concessioners’ improvements, then the Secretary will, before making such determination effective, take such action as may be necessary to assure the Concessioners of compensation [1] for their possessory interest in such improvements in the amount of their book value * * *.
(3) Payment of the compensation provided for in this section will terminate the Concessioners’ possessory interest in the improvements to which it relates and will constitute just compensation for the termination or taking of such possessory interest.
24. During 1966, the final year of plaintiffs’ operation of the resort concession, defendant decided not to renew the contract. Plaintiffs were so advised by letter on August 22, *947 1966. This decision was based upon several accumulated determinations by the Park Service superintendent and his superiors. Defendant wanted to return the area to its natural condition in order to promote, in defendant’s opinion, the public interest in the operation of the Olympic National Park. The terrain in which the resort was located was, also, very steep and unsuitable for it. Defendant does not intend to continue commercial operation of the Olympic Hot Springs through any concessionaires. Defendant had observed a steady, general deterioration of the resort. Defendant concluded that there were a number of serious deficiencies in the facilities and their operation which posed hazards to public health and safety. Such deficiencies included deteriorated electrical insulation which plaintiffs were required to replace at a cost of approximately $3,000. Sanitation facilities were believed inadequate. The bacterial count in the swimming and wading pools still did not satisfy the Public Health Service. The concession also had been operating at a steady financial loss since 1961. Eeasons for the loss factor included under-capitalization, inefficient management, the advancing age of plaintiffs, and the competition of a public swimming pool built in Port Angeles in the mid-1950’s. Public belief in the therapeutic value of hot sulphur baths has declined, also, with development of modern medicine.
25. By letter dated December 19, 1966, from the superintendent of Olympic National Park, plaintiffs were offered $10,368.63 as the calculated book value of their possessory interest remaining in the fixed, capital improvements as of December 31,1966. The audit report in evidence for the year 1966 shows plaintiffs’ depreciated book value of capital improvements to be $10,371.80 on an original total investment of $81,826.29. Plaintiffs had, as of December 31, 1966, taken total depreciation in the sum of $71,454.49. Plaintiffs have returned to defendant a check tendered for book value, less the $310 franchise fee remaining unpaid for 1966. Defendant counterclaims for the $310 and admits that it owes plaintiffs $10,061.80.
26. Plaintiffs claim that defendant breached the obligations contained in the 1957 and 1963 contracts and is estopped *948 from denying plaintiffs’ right to just compensation in the sum of $67,000[2] for its possessory interest in capital improvements made to operate the concession. Plaintiffs called Alden W. Planson, a well-qualified, expert, real estate appraiser, as a witness. Mr. Hanson found it necessary to reject fair market value as the test of just compensation claimed by plaintiffs, because there were no comparable sales. He also rejected the capitalized income approach since the concession was underdeveloped and did not operate at a profit. In reaching his valuation of $67,000, he did use the appraisal technique of reproduction cost less depreciation and deferred maintenance, including functional and economic obsolescence. He personally inspected the property in issue.
27. The Hanson valuation estimated that reproduction cost of the improvements before depreciation, as of December 31, 1966, would total $231,600. After depreciation, the figure would be reduced to $71,694, from which he subtracted an additional $5,000 for deferred maintenance. The total, rounded off, is $67,000. It is found that this figure should be further reduced by $5,200, being overstated by the inclusion therein of $2,400 for plaintiffs’ contribution to public road and bridge improvements, and $2,800 for a generator which can be removed from the site. The correct adjusted total on the Hanson estimate is found to be $61,800.
28. Plaintiffs offered, and there was received into evidence without objection, an appraisal report by H. D. Wimer, an employee of the National Park Service, an experienced appraiser. Neither party called Mr. Wimer as a witness although he was in the courtroom. Mr. Wimer personally inspected the property and his valuation is as of September 27, 1966. Using the valuation technique of the current *949 cost of reproducing tbe improvements, less depreciation from physical deterioration and functional and economic obsolescence, Wimer concluded that $48,250 would represent just compensation. This estimate is based on Wimer’s estimate of reproduction cost before depreciation of $98,902. Defendant rejects this estimate as a matter of law, and plaintiffs reject it as inadequate.
Ultimate FINDING
29. The weight of the credible evidence supports the conclusion that book value less the amount of plaintiffs’ unpaid franchise fee represents just compensation to plaintiffs for their possessory interest in fixed improvements at Olympic Hot Springs.
CONCLUSION OE Law
Upon the foregoing findings of fact and opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiffs are entitled to recover the sum of $10,371.80. It is further concluded that defendant is entitled to recover on its counterclaim the sum of $310, which is to be offset against plaintiffs’ recovery. -T-here-fere, it is adjudged and ordered that judgment be entered fen plaintiffs in the set amount ef $40^fi4r8Qr.*

 At the time of the trial In October 1969, Mrs. Schoeftel testified that she was 74 years of age, and Mr. Schoeffel said that he was 73. Discussions referred to are for a contract for a period after the expiration of the 5-year contract on December 31,1962.

 The petition claimed $125,000 as the value of plaintiffs’ improvements. The smaller sum is based on plaintiffs’ evidence produced at the trial. The petition also claimed $200,000 as representing the true value of plaintiffs’ loss of the right to the beneficial use of the -waters of Olympic Hot Springs. This part of the claim has been abandoned, no evidence having been offered on It, and no findings having been requested. The petition also, claimed an additional $500,000 as the alleged value of a perfected mining claim to 20 acres, including the area upon which the Olympic Hot Springs are located. At the trial, plaintiffs elected not to offer proof on this issue upon the ruling of the commissioner that it must first be determined administratively.

This judgment was vacated by order of February 5, 1971, it appearing to tbe court that defendant bad paid plaintiffs the sum of $10,061.80, without prejudice to plaintiffs’ further prosecution of tbe case, subsequent to the filing of the trial commissioner’s opinion and report and prior to its adoption by the court.