**SNOWBANK ENTERPRISES, INC.**

v.

**The UNITED STATES.**

No. 118–81L.

United States Claims Court.

Oct. 26, 1984.

---

478

Thomas G. Barry, Jr., Minnetonka, Minn., for plaintiff. Harlan G. Sween and Ronald D. Alley, Minnetonka, Minn., of counsel.

James T. Draude, Washington, D.C., with whom was Asst. Atty. Gen. F. Henry Habicht, II, Washington, D.C., for defendant.

## OPINION

YOCK, Judge.

This case arises under section 5(a) of the Boundary Waters Canoe Area Wilderness Act of 1978 (BWCAW Act), Pub.L. No. 95–495, 92 Stat. 1649, which provides that owners of resorts located on land riparian to certain lakes in Minnesota may require the United States Government to purchase their properties. The plaintiff is the owner of a resort qualified for purchase by the Government. On October 27, 1978, the plaintiff properly notified the United States Forest Service that it wished to invoke the buy-out provision of the BWCAW Act. Thereafter, the Forest Service commissioned an appraisal of the plaintiff's resort and, upon completion of the appraisal, offered to purchase the plaintiff's resort for the appraised price. The plaintiff rejected the Government's offer as being too low and, after the United States District Court for the District of Minnesota dismissed its first suit, filed suit in the United States Court of Claims to recover the fair market value of its property. The case was transferred to this Court on October 1, 1982. The defendant has admitted that it is obligated to purchase the plaintiff's property. The only issue before this Court, therefore, is the price which the defendant must pay for the plaintiff's property.

After considering the entire record in this case, the Court has concluded that the fair market value of the plaintiff's property on October 27, 1978, was $756,691. Accordingly, the plaintiff is entitled to recover that amount in exchange for transferring title of its property to the Government.

### Facts

The plaintiff, Snowbank Enterprises, Inc. (Snowbank), is the owner of the Snowbank Lodge, a lakefront resort located on land riparian to Snowbank Lake, Lake County, in northeastern Minnesota. Snowbank Lake is a large spring-fed lake located approximately twenty miles east of Ely, Minnesota, and approximately three miles south of the Canadian border. The northern two-thirds of Snowbank Lake lies within the borders of the Boundary Waters Canoe Area Wilderness (BWCAW), a wilderness area of some 1,080,300 acres of lakes, streams and forest.[1] The lake was originally classified by the Minnesota Department of Natural Resources as a trout lake, with the natural trout population being supplemented by lake trout stocked by

---

1. The BWCAW was originally designated the Boundary Waters Canoe Area (BWCA), which was included in the National Wilderness Preservation System, as established by the Wilderness Act of 1964, Pub.L. No. 88–577, 78 Stat. 890, *codified in* 16 U.S.C. § 1131 *et seq.* The Boundary Waters Canoe Area Wilderness Act of 1978, Pub.L. No. 95–495, 92 Stat. 1649, redesignated the BWCA as the Boundary Waters Canoe Area Wilderness. For the sake of simplicity, the wilderness area will hereinafter be referred to as the BWCAW.

the State of Minnesota. Snowbank Lake has also maintained a natural population of walleye and of northern pike. Overall, the water in the lake is of an exceptionally high clarity and purity.

Snowbank Lodge is located in the southwest corner of Snowbank Lake, outside the borders of the BWCAW. The property consists of a 10.75 acre peninsula having 3,250 feet of lake frontage and 26,792 square feet of building area encompassed within its 28 buildings. The resort is on a virtually private lake (very little developed land) with a large capacity for summer and winter business. During the summer months, the resort featured fishing, canoeing, motorboating and water sports. During the winter months, hunting, ice fishing, snowmobiling, and cross-country skiing were featured.

Prior to 1972, Snowbank Lodge was operated as a commercial summer resort. In February of 1972, the plaintiff, Snowbank Enterprises, Inc.,[2] purchased the real property and business for a total sale price of $275,000. The plaintiff took possession of the property and kept the resort in commercial operation until October 27, 1978.

The most unique feature of the property is the main lodge building, located in the northeast corner of the peninsula, which encompasses some 6,000 square feet of building space and which is constructed of white pine logs approaching 25 inches in diameter and 40 feet in length. The building contains: a dining room capable of seating 180 people; a large kitchen; a cocktail lounge with a dance floor; a game room; an office; restrooms; a two-bedroom apartment unit having a living room, a dining room, a dressing room, and a full bath; and two motel-style rooms, each with a private bath. Along the interior wall of the dining room, a massive granite (rock) fireplace backs up to an identical fireplace in the adjoining lounge. Since purchasing the resort, the plaintiff has completely refinished and carpeted the entire dining room and has completely insulated and winterized the lodge building. In addition to serving the resort's guests, the lodge dining room and cocktail lounge attracted patrons from neighboring communities. Partially, this attraction was caused by the resort's having one of only five liquor licenses issued in Lake County, Minnesota, in 1978. The next closest establishment with a liquor license was approximately 20 miles away. This license was transferable by the plaintiff to a subsequent purchaser of the resort.

Snowbank Lodge also included twenty resort cabins, all of which were of the log or frame construction type, each having a private dock and a private adjacent parking space. Further, eighteen of these cabins had a magnificent view of Snowbank Lake. Specifically, the following cabins existed:[3]

Cabin 1—A six bedroom, two-story, fully winterized, modern frame structure, with two full bathrooms, built around 1931.

Cabin 2—A partially winterized, cedar log cabin.

Cabin 3—A four bedroom, half log sided frame structure.

Cabin 4—A three bedroom, partially winterized, frame structure, with knotty pine paneled walls and ceiling, built around 1970.

Cabins 5 and 6—One bedroom, fully winterized, half log sided frame structures, with knotty pine paneled walls and ceilings, neither having a view of the lake.

Cabin 8—A four bedroom, half log sided frame structure, with knotty pine paneled walls and ceiling.

Cabin 9—A four bedroom, partially vertical log structure.

Cabin 10—A one bedroom, fully winterized log cabin, having two twin beds and one double bed, with an open gothic style ceiling.

---

2. The plaintiff's shareholders are John McCallick, the president of the corporation, Martin Breaker, the vice president, Charlotte Breaker and John McCallick, III.

3. Cabin 7, while owned by the plaintiff on October 27, 1978, is not a part of the property which has been offered to the Government under section 5(a) of the BWCAW Act.

Cabin 11—A four bedroom, fully winterized, frame structure.

Cabin 12—A three bedroom, completely remodeled, partially winterized, half log sided frame structure, with knotty pine paneled walls and ceiling.

Cabin 13—A four bedroom, fully winterized, half log sided frame structure, with knotty pine paneled walls and ceiling.

Cabin 14—A two bedroom, partially winterized, completely remodeled, frame structure.

Cabin 15—A two bedroom, fully winterized, frame structure.

Cabin 16—A one bedroom, fully winterized, frame structure, with knotty pine paneled walls and ceiling, built around 1967.

Cabin 17—A two bedroom, fully winterized, frame structure, with knotty pine paneled walls and ceiling, built around 1969.

Cabin 18—A large three bedroom, fully winterized, frame structure, with a six foot wide fireplace, built around 1936.

Cabin 19—A two bedroom, fully winterized, frame structure, with knotty pine paneled walls and ceiling, built around 1969.

Cabin 20—A three bedroom, partially winterized, half log sided frame structure, built around 1970.

Cabin 21—A one bedroom, partially winterized, frame structure, with mahogany paneled walls and ceiling, built around 1970.

As of October 1978, all of the twenty cabins were in good condition and of solid construction.[4] Approximately fifteen cabins rest on poured concrete slab foundations, with the remainder resting on cedar post footings. Since the plaintiff purchased the resort in 1972, all of the cabins have been modernized, including kitchen and plumbing facilities, have been fitted with double-pane thermal windows and picture windows, and have had new roofs

installed. Further, every cabin was easily accessible by road.

Situated to the west of the main lodge building are two boathouses. The older of the two structures was in poor condition and was used by the plaintiff for storage and as quarters for the resort's semi-retired caretaker. The newer boathouse is a large 3,300 square foot two-story, fully winterized, frame building, resting on a concrete slab foundation. When the plaintiff purchased the property in 1972, the second floor of this boathouse was a large, undivided room which was used as a bunk area for large groups. Between 1972 and 1978, this structure was completely remodeled and the second-floor bunk area was divided into nine separate bedrooms, complete with a living room, a kitchen and two bathrooms. Each bedroom was carpeted and electric heaters were installed. On the first floor, John McCallick, the plaintiff's president, remodeled an existing laundry facility and tackle shop. A window was installed in the tackle shop, and double doors, providing access to a garage and work area, were installed in the west wall of the building. In addition, a game room was constructed adjacent to the tackle shop.

Shortly after the plaintiff purchased Snowbank Lodge, the owners embarked upon an ambitious program to improve the property. In April of 1972, the plaintiff began construction of a motel building. This two-story, fully winterized, frame structure contains twelve rental units. The second floor consists of nine motel-type rooms, each having a bathroom, a shower, and hot and cold running water. All of these rooms were carpeted and contained an electric heater. The ground floor of the building was subdivided into three three-bedroom apartments, each having a living room, a kitchen/dining room, a bathroom with a shower and a tub, and hot and cold running water. The motel was equipped

**4.** For the purposes of this case, the agreed date of valuation is October 27, 1978. All descriptions of improvements to the subject property, hereinafter discussed, refer to the condition of the property on or prior to October 27, 1978. The Court has disregarded any changes in the condition of the property after that date.

with large picture windows offering an excellent view of the lake.

In addition, Mr. McCallick supervised the winterization of a substantial number of the resort's buildings. This was accomplished by: installing insulation in the walls and attics, sealing doors and windows with weather stripping, insulating the entire resort water and sewer systems, replacing plastic pvc pipe with copper tubing, installing heat elements in the water pipes, and moving plumbing into the interior of each cabin. In particular, the resort's potable water system, consisting of a well, pumping system, and a network of approximately 3,500 feet of main water lines, was insulated and wrapped with some 7,000 feet of electrical trace heaters (glass coated nichrome wire), which was then connected to an automatic timing system. Further, each of the winterized structures—cabins, motel, lodge, and boathouse—was equipped with electric heaters.

Between 1972 and 1978, the roofs on all of the cabins were replaced, and the roof on the main lodge was replaced and insulated. The cost of this remodeling and reroofing, on the main lodge alone amounted to approximately $30,000. In addition, high quality carpeting was installed in every cabin. Further, the resort's entire septic/sewer system was replaced.

In addition to the above structures, the resort contained a 15-site campground, with hookups capable of handling trailers, motorhomes, and other recreational vehicles. The campground area included restrooms and showers for use by the campers. Further, the plaintiff had designated certain areas for use by tent campers. These areas were capable of providing electricity and water to the campers. The plaintiff also reworked and regraded all the roads at Snowbank Lodge.

Following a billing dispute with the local power company, the plaintiff purchased all of the electric delivery equipment located on the resort property. This equipment included: all of the electric poles, transformers, wiring, outside lights, and six mercury vapor street lights. The estimated replacement cost of this equipment, in 1978, was approximately $30,000 to $40,000. Following the acquisition of this equipment, the plaintiff rewired almost 90 percent of the entire system. The resort's electrical system was connected to a reconditioned 25 kilowatt generator, which the plaintiff had upgraded to a rating of 45 kilowatts. In the event of a general power failure, the generator was capable of maintaining refrigeration and minimal heat in each cabin, the motel, and the main lodge building. The generator alone was valued at approximately $4,000 on October 27, 1978.

The plaintiff operated the Snowbank Lodge resort for six years and nine months, from February 1972 through October 1978. From the beginning, the owners decided that they would target the resort's business to appeal to a high class of wilderness sportsmen. The typical patrons would be sportsmen who had considerable money to spend on their vacation, were older, and were established in their businesses or professions. The patrons would want luxurious appointments as well as superb wilderness surroundings. As a result, although the plaintiff charged rates generally higher than those charged by other resort owners in northeastern Minnesota, its business steadily increased from year to year. Its gross earnings, during the years of the plaintiff's ownership, were as follows:

| Year | Earnings |
|------|----------|
| 1972 – | $ 66,000 |
| 1973 – | 99,000 |
| 1974 – | 129,000 |
| 1975 – | 130,000 |
| 1976 – | 163,000 |
| 1977 – | 180,000 |
| 1978 – | 153,000 |

During the months of June and July, occupancy at Snowbank Lodge approached 90–95 percent. It is thus clear that the plaintiff succeeded, or was well on its way to succeeding, in bringing a very high class resort operation to Snowbank Lodge.

At the time the plaintiff purchased Snowbank Lodge, it had previously been operated solely as a summer resort. However, after the motel was built and a number of

the cabins were winterized, the plaintiff began to develop its winter business operations. Both hunters, in the fall, and ice fishermen, in the winter, would stay at the resort. Cross-country skiers also occasionally stayed at the resort. A good portion of plaintiff's winter business, however, came from snowmobilers who used the extensive system of trails in the BWCA.

In the mid-1970's, the Forest Service announced a proposed ban on the use of snowmobiles in the BWCA. In anticipation of the impending ban on snowmobile use, the plaintiff determined that maintaining a winter operation was no longer economically feasible. As a result, following the 1974–1975 winter season, the plaintiff halted winter operations and discontinued winterizing the remaining cabins. Thereafter, in September of 1976, the Secretary of Agriculture announced a total ban on the use of snowmobiles within the borders of the BWCA.

As noted above, Snowbank Lodge held one of five liquor licenses in Lake County, Minnesota, and the restaurant served customers from as far away as Duluth, Minnesota, some 135 miles to the south, as well as the resort's overnight guests. The plaintiff also hosted many large gatherings and conventions. For example, the U.S. Forest Service and the Mississippi River Commission both used the Snowbank Lodge facilities for meetings. Corporations, such as Honeywell and U.S. Steel, held company group outings at the resort. On one occasion, the resort hosted the Great Lakes Outdoor Sportswriters Convention, attended by approximately 350 people.

A significant factor in the plaintiff's success, in attracting guests to the Snowbank Lodge, was the location of the resort at the edge of the BWCA. The BWCA lies along the international border with Canada and is complemented on the Canadian side of the border by the Quetico Provincial Park. It is the largest wilderness area east of the Rocky Mountains and is the only lakeland canoe area wilderness in the nation. Located within the BWCA are over 1,000 lakes linked by hundreds of miles of streams and short portages. Despite the area's relative isolation, it is the most heavily visited wilderness area in the national wilderness system and is a hauntingly beautiful area of the United States.

The Federal Government has long recognized the unique quality of this lake country wilderness, beginning over three-quarters of a century ago to insure its preservation. Initially, preservation of this area was undertaken when certain federal land was set aside as a forest reservation. Additional acreage was reserved in 1905 and 1908, and it was from these lands that President Theodore Roosevelt proclaimed the Superior National Forest in 1909. Additional lands were added to the forest reservation in succeeding years.

On September 17, 1926, the Secretary of Agriculture responded to a controversy over Government road building by committing the U.S. Forest Service to a policy of constructing no additional roads within this forest reservation area. Thereafter, congressional action to protect the area included: the Shipstead-Nolan Act of 1930, 16 U.S.C. §§ 577–577b, which protected the area's lakeshores by prohibiting the building of dams; the Thye-Blatnik Act of 1948, 16 U.S.C. §§ 577c–577h, which appropriated funds for the acquisition of privately-owned holdings scattered throughout the area; and the Humphrey-Thye-Blatnik-Andresen Act of 1956, 16 U.S.C. §§ 577d–1, 577g–1, 577h, which extended the Thye-Blatnik Act.

In 1956, Senator Hubert H. Humphrey, of Minnesota, introduced the first version of a bill that ultimately was enacted as the Wilderness Act of 1964, S. 4013, 84th Cong. 2d Sess., 102 Cong.Rec. 9775 (1956). While this bill was originally intended to ban all motorized vehicles in the named wilderness areas, a storm of protest over the bill, primarily from commercial users of the wilderness area, resulted in the adding of a provision "that nothing in this act shall preclude the continuance within th[e] roadless areas of any already established use of motorboats." This provision remained in

all subsequent versions of the bill and was enacted as a part of section 4(d)(5) of the Wilderness Act of 1964, Pub.L. No. 88–577, 78 Stat. 890.

In 1978, Congress enacted the BWCAW Act, extending the boundaries of the BWCA to include an additional 45,500 acres and redesignating it as the Boundary Waters Canoe Area Wilderness. The BWCAW Act, for the first time, restricted the number of lakes within the BWCAW upon which outboard motors could be used. Further, the Act imposed maximum horsepower limits in order for such motors to be used on certain designated lakes. Motorboat usage on the portion of Snowbank Lake, within the BWCAW, was restricted to boats with outboard motors of not more than 25 horsepower.

Section 5(a) of the BWCAW Act provides that certain qualifying resort owners in northeastern Minnesota may compel the Government, through the Secretary of Agriculture, to purchase their resorts. Specifically, section 5(a) provides:

> The owner of a resort in commercial operation during 1975, 1976 or 1977 and located on land riparian to any of the lakes listed below may require purchase of that resort, including land and buildings appurtenant thereto, by written notice to the Secretary [of Agriculture] prior to September 30, 1985. The value of such resort for purposes of such sale shall be based upon its fair market value as of July 1, 1978, or as of the date of said written notice, whichever is greater, without regard to restrictions imposed by this Act. * * *

Accordingly, Snowbank Lodge, on Snowbank Lake, is a resort qualified for purchase by the Government, pursuant to the terms of section 5(a).

On October 27, 1978, six days after the BWCAW Act became effective, the plaintiff notified the Forest Service of its intention to invoke the buy-out provisions of the Act. Thereafter, the Forest Service had the plaintiff's property appraised by Mr.

Douglas E. Fruen, a professional appraiser from Minneapolis, Minnesota. In a letter dated December 20, 1979, the Forest Service notified Mr. Martin Breaker, the plaintiff's vice president and a principal shareholder, that the appraised value of the Snowbank Lodge resort, as of October 27, 1978, was $536,500. The letter went on to describe the appraisal techniques used in valuing the property and also stated:

> With the presentation of this offer, you basically have three alternatives.
>
> 1. You can accept the offer as stated and we will prepare purchase option forms.
>
> 2. You can reject the offer and decide not to sell to the Government. * * *
>
> 3. If you still desire to sell but don't agree with the value presented, the Government will initiate condemnation action solely for the purpose of determining the amount of compensation, based upon fair market value.

Thereafter, in a second undated letter, the Forest Service stated that its letter of December 20, 1979, contained a slight error and that the Government's offer should have been to purchase the plaintiff's property for $536,550.[5]

In a letter dated January 16, 1980, the plaintiff notified the Forest Service that the Government's offer was unacceptably low and was, therefore, rejected. The plaintiff's counsel requested that the Government "initiate condemnation proceedings in accordance with Pub.L. 95–495." Thereafter, in a letter dated January 23, 1980, the Forest Service informed the plaintiff's counsel that the Forest Service had reevaluated its earlier position on condemnation and had decided that proceeding with a condemnation action would be inappropriate. Another letter, dated March 3, 1980, reaffirmed the Government's position, noting that: "[t]he third alternative does not exist. The other two alternatives listed are the ones available * * *."

---

5. The appraised value of the property was later reduced to $525,000 to correct for several erroneous assumptions on the part of Mr. Douglas E. Fruen, the defendant's appraiser.

On June 11, 1980, the plaintiff filed suit in the United States District Court for the District of Minnesota seeking to compel the Government to purchase the Snowbank Lodge property. The Government moved to dismiss the complaint and, on January 23, 1981, the district court dismissed the plaintiff's action without prejudice, observing that the United States Court of Claims was the appropriate forum for plaintiff's action. On March 3, 1981, the plaintiff filed a petition with the Court of Claims seeking to recover the fair market value of its property as of October 27, 1978.

The defendant has admitted that it is obligated to purchase the plaintiff's property. A trial to determine the fair market value of plaintiff's property was held on October 19–22, 1982, in Minneapolis, Minnesota.

### Discussion

The plaintiff asserts that as of October 27, 1978, the agreed date of valuation, Snowbank Lodge had a fair market value of $1,360,000. In support of its valuation, the plaintiff argues that its property was unique among resort properties in northeastern Minnesota and was the site of numerous high quality improvements. In addition, the plaintiff seeks to recover interest on any judgment of this Court. In support of its claimed entitlement to receive interest, the plaintiff argues that the passage of the BWCAW Act and the Government's subsequent delay in purchasing Snowbank Lodge effected a taking by inverse condemnation. An award of interest on any judgment of this Court, the plaintiff asserts, is mandated by the fifth amendment and is necessary to prevent the Government from being unjustly enriched.

The defendant counters that as of October 27, 1978, the fair market value of the plaintiff's property was not more than $525,000. The defendant maintains that the plaintiff's valuation of the property defies common sense and is unrealistically high. The defendant also argues that the plaintiff may not recover interest on any judgment in its favor. Specifically, the defendant argues that the plaintiff's action arises under section 5(a) of the BWCAW Act and is, therefore, not grounded upon the fifth amendment. Further, the defendant argues that the Act contains no provision providing for the payment of interest on claims arising under section 5(a). In addition, the defendant asserts that the plaintiff's inverse condemnation claim is untimely in that it was only in its post-trial reply brief, filed long after the record was closed, that the plaintiff raised this argument. Moreover, the defendant argues that any delay in its tendering of payment to the plaintiff for the subject property is due to the plaintiff's own delay in pursuing its case in this Court.

### A. The Standard of Valuation

Section 5(a) of the BWCAW Act authorizes qualified resort owners in northeastern Minnesota to require the Government to purchase their property at its "fair market value as of July 1, 1978, or of the date of * * * notice, whichever is greater." Fair market value is generally defined as the amount a willing buyer would pay a willing seller, with neither party being under any compulsion to buy or sell and with both parties being fully informed as to all relevant matters regarding the transaction. See United States v. Miller, 317 U.S. 369, 374, 63 S.Ct. 276, 280, 87 L.Ed. 336 (1943); United States v. 91.90 Acres of Land, 586 F.2d 79, 86 (8th Cir.1978). The concept of fair market value is useful in valuing property because "[m]ost things * * * have a general demand which gives them a value transferable from one owner to another. As opposed to such personal and variant standards as value to the particular owner whose property has been taken, this transferable value has an external validity * *." Kimball Laundry Co. v. United States, 338 U.S. 1, 5, 69 S.Ct. 1434, 1437, 93 L.Ed. 1765 (1949).

Any and all factors, which would cause a reasonable seller to ask a higher sale price for the property and which would induce a reasonable buyer to pay a higher sale price for the property, should be considered. An owner of property, therefore,

is entitled to have the fair market value of his property determined by reference to its highest and best use. *Olson v. United States*, 292 U.S. 246, 256–57, 54 S.Ct. 704, 709–10, 78 L.Ed. 1236 (1934); *United States v. 91.90 Acres of Land, supra*, 586 F.2d at 86. The existence of improvements to the property, and the condition and quality of such improvements, must also be considered in the assessment of fair market value. *See Almota Farmers Elevator & Warehouse Co. v. United States*, 409 U.S. 470, 474, 93 S.Ct. 791, 794, 35 L.Ed.2d 1 (1973).

Since the concept of fair market value is intimately related to the anticipated selling price of a particular piece of property, courts have generally recognized that sales of comparable properties provide the best evidence of market value. *U.S. v. Sowards*, 370 F.2d 87, 89 (10th Cir.1966). *See also United States v. 179.26 Acres of Land in Douglas County, Kansas*, 644 F.2d 367 (10th Cir.1981); *Foster v. United States*, 2 Cl.Ct. 426 (1983). The validity of the comparable sales approach to valuation, however, depends upon the degree of comparability between the subject property and the properties used for comparison. *United States v. 103.38 Acres of Land, More or Less*, 660 F.2d 208, 211 (6th Cir.1981). It is axiomatic that no two parcels of property are truly identical, and, as a result, the term "comparable" merely means similar in as many respects as possible. *Id.* Generally, comparable sales evidence has probative value only if the subject and comparison properties have similar characteristics and if the comparison sales are not too remote in time or place from the applicable date of valuation and the site of the subject property. *See* B. Gelin & W. Miller, *The Federal Law of Eminent Domain*, § 4.2, at 286–88 (Michie 1982). Further, according to Mr. Fruen, the comparable sales approach is most accurate when comparable properties can be located which are both "bigger and better" than the subject property and which are "smaller and inferior" to the subject property. In fact, the testimony indicates that the comparable sales approach is "kind of like a range

firing on the old 105, we overshot, undershot and then we try to hit it." As will be discussed later, this Court finds that the parties inability to similarly "bracket" the Snowbank Lodge resort is a substantial defect in both experts' reliance on the comparable sales approach.

Where no comparable sales evidence is available, the income capitalization approach is, for the most part, the next best approach to valuation. *United States v. 179.26 Acres of Land in Douglas County, Kansas, supra*, 644 F.2d at 371–72. Under this method, the value of a particular piece of property is shown by calculating the present value of the income the property could be expected to generate over its useful economic life. *Foster v. United States, supra*, 2 Cl.Ct. at 447. Both parties, however, have agreed that the use of the income capitalization approach, in the instant case, would be inappropriate. In deciding not to use this approach, they cite such factors as: the quality of life motive for ownership in northeastern Minnesota, the continued developing of the Snowbank Lodge business, and the changing of governmental regulations in the area. Neither of the experts, therefore, have used the income capitalization approach in this case, a decision with which this Court concurs.

Finally, the reproduction or replacement cost approach produces a valuation estimate by establishing the cost to replace the property, less depreciation, at a different but comparable site. *See* Gelin & Wright, *The Federal Law of Eminent Domain, supra*, § 4.1 at 200. The courts have generally disfavored the replacement cost approach, since it frequently results in an excessively high valuation, since it sets an absolute ceiling on the value of a particular structure which may not be, and usually is not, considered in actual market negotiations between a buyer and a seller. *United States v. Benning Housing Corp.*, 276 F.2d 248, 250 (5th Cir.1960). Further, it often cannot be established that the property being appraised, under the replacement cost method, could actually be replaced. *See United States v. Certain Interests in*

*Property in Champaign County,* 271 F.2d 379 (7th Cir.1959); *Schoeffel v. United States,* 193 Ct.Cl. 923 (1971); *Bishop v. United States,* 164 Ct.Cl. 717 (1964). Nevertheless, under some circumstances, the replacement cost method may be used to establish fair market value, particularly when evidence of comparable sales is lacking and the income capitalization approach is inapplicable. *See United States v. Certain Interests in Property in Champaign County, supra; Schoeffel v. United States, supra; Bishop v. United States, supra. See also Miles v. District of Columbia,* 510 F.2d 188, 195 (D.C.Cir.1975).

Since a particular parcel of real property, whether improved or unimproved, is always unique, it is unrealistic to expect that any of the above valuation techniques will reflect true market value with exactitude. *United States v. Miller, supra,* 317 U.S. at 374, 63 S.Ct. at 280. *See also Foster v. United States, supra,* 2 Cl.Ct. at 446–47 (1983). Nevertheless, "market value determinations must be reached, even though valuation methods employed by the parties make the path to such determinations more difficult." *Georgia-Pacific Corp. v. United States,* 226 Ct.Cl. 95, 107, 640 F.2d 328, 336–37 (1980). In the instant case, the expert testimony elicited at trial highlights the "guess-work" involved in appraising a particular piece of property. While the plaintiff's expert, Mr. Gary Lee Hawkinson, attempted to blend the replacement cost approach with the comparable sales approach in determining the fair market value of Snowbank Lodge, the defendant's expert, Mr. Douglas E. Fruen, offered his estimate of fair market value, using solely the comparable sales approach, based upon vague "adjustments," which he was unable to explain to the Court or to detail in the record.

■ A trial court is not restricted to any of these methods in arriving at its determination of fair market value. Its valuation analysis may be based upon the comparable sales, the replacement cost, the income

capitalization or upon any combination of these three appraisal methods. *See Sill Corp. v. United States,* 343 F.2d 411, 416 (10th Cir.), *cert. denied,* 382 U.S. 840, 86 S.Ct. 88, 15 L.Ed.2d 81 (1965).

The parties agree that the Government is obligated to purchase the plaintiff's property at its fair market value as of October 27, 1978, the date the plaintiff first notified the Forest Service of its intention to invoke the provisions of section 5(a) of the BWCAW Act. The parties, however, have been unable to agree upon its fair market value.

### B. *The Plaintiff's Appraisal*

The plaintiff relied upon the testimony of Mr. John McCallick, the plaintiff's president, Mr. Martin Breaker,[6] the plaintiff's vice president, and Mr. Gary Hawkinson, the plaintiff's expert valuation witness, to establish the fair market value for the plaintiff's property. Mr. McCallick, an electrician by trade, estimated the fair market value of Snowbank Lodge to be $1,750,000. Mr. Breaker, a native of northern Minnesota, estimated the property's value to be $1,500,000. On the basis of his experience, familiarity with the northeastern Minnesota area, and personal appraisal of the property, Mr. Hawkinson estimated the value of Snowbank Lodge to be $1,360,000.

■ This Court has given careful consideration to the testimony of both Mr. McCallick and Mr. Breaker and has concluded that their valuation estimates are speculative and unsupported by the record. Although an owner of real property frequently has special knowledge about his land and is, therefore, deemed competent to offer an opinion as to its value, his opinion must be founded upon evidence in the record, rather than upon conjecture, speculation or unwarranted assumptions. *United States v. Sowards, supra,* 370 F.2d at 92. Aside from referring to the renovation of the property between 1972 and 1978, neither Mr. McCallick nor Mr. Breaker cited any significant factors to support their valuation estimates. While Mr. McCallick

---

**6.** Due to military training commitments, Mr. Breaker was unable to attend the trial. However, a transcript of his deposition was introduced into evidence at trial.

is both experienced in the construction industry and familiar with construction costs, he failed to establish the basis for his valuation estimate. Mr. McCallick's valuation was more the result of unfounded speculation by an owner, rather than the product of a reasoned analysis. Furthermore, Mr. McCallick's valuation appeared to be unduly influenced by what he feels the property should be worth in view of the hard work and effort put in by the owners during the six and one-half years that they operated Snowbank Lodge. Likewise, Mr. Breaker's testimony offered no clue as to the source of his opinion, apart from his mere ownership of the subject property. The Court is constrained, therefore, to give little weight to the ultimate valuation testimony of either witness. Much of their individual testimony regarding the Snowbank Lodge resort, however, was useful to the Court in arriving at its determination of the property's fair market value.

The plaintiff also relied upon the expert testimony of Mr. Gary Hawkinson to establish the fair market value of Snowbank Lodge. Mr. Hawkinson is a resident of Grand Rapids, Minnesota, a major lake region community located in northeastern Minnesota, some 120 miles from Snowbank Lodge. He owns and operates a small recreational trailer park, does construction and remodeling work, manages various properties owned by himself and his father, and works as a professional real estate appraiser. He holds a Minnesota Limited Real Estate Brokers license and subdivided land license. He holds a bachelor of science degree in business administration from Bemidji State College in Bemidji, Minnesota, and has completed various continuing education classes and seminars in real estate appraisal and investment.

In the northern Minnesota area, Mr. Hawkinson has completed between 150 to 200 appraisals, including the appraisal of a number of resorts similar to Snowbank Lodge. At some point prior to trial, he was appointed as a Commissioner in eminent domain proceedings for Itasca County, Minnesota. Further, through his experience as a contractor, he has gained a working knowledge of the construction practices and costs in the northern Minnesota area.

The defendant objected to Mr. Hawkinson's ability to offer an expert opinion as to the fair market value of the subject property. Specifically, the defendant argues that Mr. Hawkinson conducts his appraisal business on a part-time basis, is not professionally trained as an appraiser, holds no professional appraisal designation (such as MAI), and is not a member of any professional appraisal organizations. The defendant further argues that the plaintiff failed to tender Mr. Hawkinson for *voir dire* examination on his qualifications and failed to offer Mr. Hawkinson to the Court as an expert in the appraisal of real property.

■ With regard to these latter objections, it is sufficient to note that the defendant's counsel did not move to strike Mr. Hawkinson's testimony after completing cross-examination. The Court heard Mr. Hawkinson testify as to his qualifications and experience and is satisfied now, as at trial, that Mr. Hawkinson was properly tendered as an expert witness and was qualified to offer his expert opinion on the issue of valuation. Mr. Hawkinson is a resident of northeastern Minnesota and is familiar with property values in the area. He has conducted numerous appraisals of real property in northern Minnesota and his testimony demonstrated familiarity with generally accepted techniques of real estate appraisal. Any lack of formal training on Mr. Hawkinson's part merely goes to the weight that this Court should accord his testimony. Further, this Court would note that the defendant's expert witness, while having more formal training in the appraising of real property, when asked at trial, was unable to explain or to verify his vague references to "adjustments," which were made in comparing the subject property to his four selected comparable properties. As a result, this Court finds that the detailed appraisal analysis provided by Mr. Hawkinson is superior to the general appraisal analysis offered by Mr. Fruen.

## 1. *Comparable Sales*

In utilizing the comparable sales approach, Mr. Hawkinson was unable to locate sales of properties truly comparable to the Snowbank Lodge property. However, after considering in excess of 25 property transactions in the northern Minnesota area, he selected three particular resort sales for comparison with the plaintiff's property: Stillwell's Resort, Kawishiwi Lodge Resort and Moose Lake Lodge Resort. Stillwell's Resort, on Lake Kabetogama, includes: three cabins, all in good condition and well maintained; a house trailer; and a boathouse. This resort sits on 1.14 acres with 100 feet of lake frontage. There is a steep grade, however, down to the shoreline. Since there was no actual sale of this resort Mr. Hawkinson merely used the seller's asking price of $92,000 for the resort, to arrive at an adjusted sales price of $104,000. In addition, the property is located some 100 miles away from Snowbank Lodge.

The second comparison property, Kawishiwi Lodge Resort, on Lake One, sold in November of 1978 for $315,000. Mr. Hawkinson decided that no adjustments to this sales price were necessary. Lake One is located within five miles of Snowbank Lake. Kawishiwi Lodge included a main lodge and sixteen cabins on 115 acres with 5,100 feet of lake frontage. However, only ten of the cabins had hot and cold running lake water and indoor bathrooms with showers. Further, three of the cabins were easily accessible only by boat across the bay. One or two of the cabins were on soft ground and their footings were sinking. The lodge, which was nowhere near comparable to the one at Snowbank Lodge, had a lunch counter and a grocery area.

The third comparison property, Moose Lake Lodge Resort, on Moose Lake, was sold for $512,400, on April 30, 1980, to the Government, pursuant to section 5(a) of the BWCAW Act. Moose Lake is located only three miles away from Snowbank Lake. Moose Lake Lodge included a main lodge, a house, and 13 cabins on 20.91 acres with 3,000 feet of lake frontage. Mr. Hawkin-

son determined the adjusted sales price of this property to be $456,036.

In comparing the three properties to Snowbank Lodge, Mr. Hawkinson made adjustments to reflect such variables as date of sale, road access, location, improvements, topography and type of lake. He then applied a multiplier to reflect his professional belief that the Snowbank Lodge property was worth more than the comparison properties. With regard to Stillwell's Resort, Mr. Hawkinson multiplied the asking price by seven. He then, in calculating the comparable sale price of Snowbank Lodge, added this amount to his estimated replacement cost of the plaintiff's motel and main lodge, arriving at a total valuation of $1,200,000. He undertook a similar analysis in the case of the Kawishiwi Lodge (using a multiplier of two) and the Moose Lake Lodge resort (also using a multiplier of two). In comparing Kawishiwi Lodge, Mr. Hawkinson also added in his estimated replacement cost of Snowbank Lodge's main lodge, motel and boathouse. He also added $100,000 for conditions of sale and the quality of lake-front on Snowbank Lake, arriving at a total comparable valuation of $1,269,000. With regard to the Moose Lake Lodge property, Mr. Hawkinson added in the replacement cost of the Snowbank Lodge main lodge, motel, boathouse and roads, arriving at a total comparable valuation of $1,357,000. On the basis of these calculations, Mr. Hawkinson estimated the fair market value of Snowbank Lodge to be $1,300,000.

Although Mr. Hawkinson undertook a comparison sales analysis, he testified that he was unable to locate truly comparable properties for comparison with the plaintiff's property. Snowbank Lodge, in his judgment, was simply superior to any property which he could locate in the northeastern Minnesota area, which had recently been sold. As a result, he coupled his comparison sales analysis with a partial replacement cost analysis. In light of this, he believed that an analysis using solely the replacement cost approach provided a more accurate measure of the fair market

value of Snowbank Lodge. Under either method, however, Mr. Hawkinson appraised the fair market value of the subject property at approximately $1,300,000.

### 2. *Replacement Cost*

Utilizing the replacement cost approach, Mr. Hawkinson estimated the fair market value of Snowbank Lodge, as of October 27, 1978, to be $1,360,000. This figure reflects Mr. Hawkinson's conclusion that the replacement cost of 10.75 acres of unimproved lakefront property, similar to the plaintiff's, was $425,000 and that the replacement cost of the improvements on the subject property was $935,000 (after appropriate deductions for observed depreciation).

Initially, Mr. Hawkinson arrived at a replacement cost for the plaintiff's land by analyzing sales of residential lakefront lots ranging in size from 0.5 to 2.31 acres and having lake frontage from 90 to 444 feet. Total sale prices of these lots ranged from $49,000 to $65,000. Mr. Hawkinson calculated, for each of these sales, a price per front foot, adjusted to reflect differences in access, topography, availability of electricity, and quality of lakefront. He then determined a mean price per front foot of $135 and multiplied this amount by 2,550 feet of the plaintiff's lake frontage. An additional 600 feet of Snowbank Lodge lakefront was valued at $70 per front foot. Four hundred feet of "viewfront," land that had a view of the lake but which abutted Government-owned land, was valued at $100 per foot. Finally, Mr. Hawkinson concluded that one hundred feet of the subject property's shoreline had no value.

Mr. Hawkinson relied on a manual of building cost estimates to establish a replacement cost for each improvement on the plaintiff's property. He then adjusted each replacement cost figure for depreciation, arriving at a final replacement cost value for each of plaintiff's improvements. With regard to the cabins, Mr. Hawkinson assigned replacement costs ranging from $28 to $44 per square foot. The average cost was slightly more than $29 per square

foot. Mr. Hawkinson then adjusted for depreciation, ranging from 15 to 30 percent. Final adjusted replacement costs for the cabins ranged from a low of $9,900 to a high of $44,300.

In contrast to the relatively low replacement cost of the cabins, Mr. Hawkinson determined that the main lodge had a replacement cost of $75 per square foot. After making a 20 percent deduction for depreciation, Mr. Hawkinson concluded that the lodge had a total replacement value of $360,000. Under cross-examination, even Mr. Fruen, the defendant's expert appraisal witness, admitted that the replacement cost of the main lodge could be as much as $500,000 for this unique one-of-a-kind structure.

Mr. Hawkinson made similar calculations with regard to the other structures and improvements on the property. The motel had a replacement cost of $113,500, after a 10 percent depreciation adjustment was taken into consideration. The boathouse had a replacement cost of $82,800, after a 30 percent depreciation adjustment.

After giving due consideration to Mr. Hawkinson's appraisal report and his testimony on his use of the replacement cost approach, this Court finds that Mr. Hawkinson's replacement cost value of $1,360,000 does not reflect the fair market value of Snowbank Lodge. In determining the replacement cost of 10.75 acres of unimproved land, Mr. Hawkinson failed to make any adjustment whatsoever for differences in size between the comparison properties and the plaintiff's property. The acreage at Snowbank Lodge is approximately 465 percent larger than the acreage of Mr. Hawkinson's largest comparison sale. Further, Snowbank Lodge's lake frontage is 732 percent greater than the lake frontage of his largest comparison property. This gross disparity in size between the plaintiff's property and Mr. Hawkinson's comparison properties resulted in an inflated valuation estimate for the unimproved land. There is no evidence in the record to suggest that a prospective purchaser who would be willing to pay a stated amount

per front foot for a small lakefront lot would pay the same unit price for a substantially larger property.

As was noted previously, the replacement cost approach is frequently disfavored, since it sets an upper limit on value which often is not even remotely approached in actual negotiations in the marketplace. *See United States v. Benning Housing Corp., supra,* 276 F.2d at 250. In fact, Mr. Hawkinson's replacement cost appraisal appears to reflect this problem. For example, Mr. Hawkinson valued the main lodge building at $360,000. Notwithstanding the unique quality and historical value of the lodge, such an amount is excessive when viewed in light of the prices purchasers were willing to pay for resort properties in northern Minnesota in 1978. Moreover, for replacement cost evidence to have probative value, it must be established that the replacement of the structures would have been a reasonable alternative. *See United States v. Toronto, Hamilton & Buffalo Navigation Co.,* 338 U.S. 396, 403, 70 S.Ct. 217, 221, 94 L.Ed. 195 (1949); *United States v. Benning Housing Corp., supra,* 276 F.2d at 250. The plaintiff has not established, to this Court's satisfaction, that the replacement of the Snowbank Lodge property would have been a viable alternative. However, the Court recognizes that Mr. Hawkinson's replacement cost estimates do reasonably reflect the cost of replacing the improvements at Snowbank Lodge.

### C. *The Defendant's Appraisal*

The defendant relied upon the appraisal and the testimony of Mr. Douglas E. Fruen, a real estate appraiser from Minneapolis, Minnesota, in estimating the fair market value of the plaintiff's property, as of October 27, 1978, to be $525,000.

In valuing Snowbank Lodge, Mr. Fruen relied exclusively on the comparable sales approach. He agreed with Mr. Hawkinson, as discussed earlier, that the income capitalization approach is inappropriate in the valuation of resort properties in northern Minnesota. Mr. Fruen disagreed, however, with Mr. Hawkinson as to the applicability of the replacement cost approach. As discussed above, this Court has determined that the replacement cost approach is inappropriate for determining the fair market value of the plaintiff's property.

Initially, Mr. Fruen visited the plaintiff's property to evaluate its location and the extent and quality of its improvements. He observed that the buildings were in very good condition and had been well maintained. After examining the subject property, Mr. Fruen located eighteen sales of resort property, occurring between 1973 and 1979, in northern Minnesota. Of these eighteen resort properties, Mr. Fruen personally inspected twelve and selected four as "comparable sales." The resorts selected for comparison were: Bear Island Resort, on Bear Island Lake; The Escape Resort, also on Bear Island Lake; the Sea Gull Resort, on Sea Gull Lake; and Kawishiwi Lodge, on Lake One.

Bear Island Resort sold in the spring of 1978 for $250,000. The property consisted of approximately 100 acres with 3,200 feet of lake frontage. The resort's improvements included: a main lodge, housing a bar and a restaurant capable of seating 125 persons; 15 cabins, each with running water; one cabin with no plumbing; and several secondary improvements, including a garage, a beach house, a swimming pool, and a sauna. The overall quality of the buildings at Bear Island was less than at Snowbank Lodge or at the defendant's other comparable resort properties. Primarily, this resulted from a two year period of poor maintenance prior to the sale of the resort. In fact, of the 16 cabins, only 11 were in operating condition. The total square feet of building space was only 12,500, as compared to Snowbank Lodge's 26,700. Only the lodge and two or three of the cabins were winterized. The lodge's restaurant had even failed to meet the state's health standards. In addition, Bear Island Lake was not as clear or pure of a lake as was Snowbank Lake, nor as good of a fishing lake. Bear Island Lake is located south of Ely, Minnesota, and approximately 30 miles southwest of Snowbank Lake.

Further, the sale price of the Bear Island resort is subject to challenge, since it resulted from a foreclosure sale of the resort.

The Escape Resort, also on Bear Island Lake, was sold in February of 1978 for $325,000. This property consisted of 70 acres having only 1,250 feet of lakefront. The resort included: a lodge and restaurant building, having approximately 4,800 square feet of building space; ten rental cabins; a three-bedroom owner's residence; and other secondary improvements, including a garage containing an unfinished apartment, two additional garages, a wash house, and a motor and gas shed. In addition, the Escape Resort, just as Snowbank Lodge, had a liquor license. The ten rental cabins consisted of one three-bedroom, one four-bedroom, and eight two-bedroom cabins. Only six of these cabins had heaters in them, with only three of these being insulated. This resort had a new lodge with a restaurant seating capacity of approximately 75 persons.

The Sea Gull Lodge sold in April of 1979 for $302,000. The property consisted of 49.37 acres having 1,700 feet of lake frontage on Sea Gull Lake. Improvements included: a four-unit motel; seven cabins, all with indoor plumbing; two owner's cabins; a relatively small lodge and restaurant building; an unfinished two-bedroom unit for employees; and several secondary structures, including a two-car garage, a laundry and a storage shed. The lodge restaurant was capable of seating about 40 to 50 persons. The seven cabins included one six-bedroom, four two-bedroom, and two one-bedroom cabins. Seagull Lake is a good, clear lake, with good fishing. It is, however, located a considerable distance away from the Snowbank Lake/Ely, Minnesota area. One reaches Seagull Lake from Ely by traveling to Grand Marais, Minnesota, and then north up the Gunflint Trail for some 160 miles.

Mr. Fruen's fourth comparison property, the Kawishiwi Resort, located on Lake One, is the same property that Mr. Hawkinson used as a comparable sale. It sold in November of 1978 for $313,000. This property consisted of 115 acres with approximately 5,100 feet of lakefront. Improvements included: a main lodge building; 16 single-unit rental cabins, including five cabins with no plumbing, one with hot and cold running lake water but no bathroom, and ten with hot and cold running lakewater and bathrooms. The most convenient access to three of the cabins was by boat, rather than by land. As discussed above, this property was of a considerably overall poorer quality than was the plaintiff's property. Lake One, while a good lake for canoeing, was a poor lake for fishing, and is generally not of the same high quality as Snowbank Lake.

Next, Mr. Fruen compared each of the above four comparison sales to the Snowbank Lodge resort with respect to: the number and size of improvements, the condition and quality of said improvements, the capacity of restaurant facilities, the amount and quality of lake frontage, the quality of each lake, the land area, the location, the access, the topography, the time of sale and the conditions of sale. After analyzing this data, Mr. Fruen concluded that the fair market value of Snowbank Lodge, on October 27, 1978, was $525,000.

The plaintiff argues that Mr. Fruen's comparison properties were substantially inferior to Snowbank Lodge and that his reliance on the comparable sales approach is therefore inappropriate. The fact that comparison properties are inferior to the subject property does not, however, totally foreclose reliance on the comparable sales approach. As long as a comparison property is roughly comparable to the subject in most respects, any differences merely go to the weight which a court will accord the evidence. *United States v. 45,-131.44 Acres of Land, More or Less,* 483 F.2d 569, 572 (10th Cir.1973); *United States v. 124.84 Acres of Land, More or Less,* 387 F.2d 912, 915 (7th Cir.1968).

Mr. Fruen testified that, since all four comparison properties were inferior to the subject property, adjustments to each comparison sale had been necessary in order to

reflect the dissimilarities between each of the four comparison properties and the plaintiff's property. As noted above, the actual adjustments that Mr. Fruen made, however, were neither explained in his appraisal report nor adequately explained in his testimony at trial.

■ In order for an appraisal report, based upon the comparison sales approach, to be of use to the trier of fact, it must set forth, in detail, any adjustments made to each comparison sale. The United States Department of Justice has recognized this requirement, noting that "[a] concise statement should accompany each sale used showing the appraiser's reasons for considering it as a comparable, the degree of comparability, physically, economically and functionally and any adjustments, plus or minus, in the comparison to the subject property." Gelin & Miller, *The Federal Law of Eminent Domain, supra*, § 4.1, at 205 (quoting A Procedural Guide for the Acquisition of Real Property by Governmental Agencies 11–12 (Department of Justice, Land and Natural Resources Division 1972)). In the absence of such a statement detailing the adjustments made, it is exceedingly difficult, if not impossible, for this Court to evaluate Mr. Fruen's comparison sales analysis and appraisal. As a result, Mr. Fruen impaired the Court's ability to scrutinize the basis for his opinion and substantially reduced the credence with which this Court can accord his appraisal of the subject property.

### D. *The Court's Determination*

■ As noted above, this Court has concluded that the comparable sales approach supplies a more accurate method of valuing the plaintiff's property than does the replacement cost approach. Of the four comparison sales that Mr. Fruen analyzed, properties two and three, the Escape Lodge and the Sea Gull Resort, had improvements which Mr. Fruen believed to be of similar quality to those at the Snowbank Lodge. However, as briefly discussed above, both of these resorts were of significantly poorer quality than was the plaintiff's resort.

For example, each resort had approximately one-half the amount of lake frontage as did Snowbank Lodge. Both properties had fewer rental units than Snowbank Lodge, which was capable of sleeping 400 people at one time. Further, the overall quality of those comparison rental units was of a lower standard of quality than those at Snowbank Lodge.

Mr. Fruen also testified that the improvements at both Bear Island Resort and Kawishiwi Lodge were of inferior quality to those found at Snowbank Lodge. Specifically, Bear Island Resort had suffered from poor maintenance for several years prior to its sale, and, as a result, only eleven of its sixteen rental units were in a habitable condition, and its lodge's kitchen did not meet Minnesota state health standards. Of the 16 single-unit rental cabins at Kawishiwi Lodge, three were best accessible by boat rather than by land. One or two of the cabins were located on soft ground, their footings were sinking, several had dry rot in their main supporting beams, and five had no indoor plumbing. The main lodge at Kawishiwi housed a snack bar rather than a fully operational restaurant.

In contrast, the cabins at Snowbank Lodge were of a significantly higher quality than those found at Bear Island Resort or at Kawishiwi Lodge and were greater in number than those at all four of the defendant's comparison properties. All of the cabins at Snowbank Lodge were re-roofed between 1972 and 1978, all were carpeted, all were heated, and all had indoor plumbing. The main lodge at Snowbank Lodge housed both a fully operational kitchen and a dining room capable of seating 180 persons. The lodge and restaurant facility at Snowbank Lodge resort simply exceeded anything available at Mr. Fruen's other four comparable properties. In addition, the new, modern, fully winterized, frame motel structure at Snowbank Lodge clearly exceeded anything available at Mr. Fruen's other four comparable properties.

As discussed earlier, Mr. McCallick completed numerous modernization projects,

adding significantly to the value of the subject property. Not all of these improvements were readily observable when Mr. Fruen examined the property. For example, the septic tanks for each cabin, the motel and the lodge had been replaced, pvc pipes had been replaced with copper tubing, the electrical system had been connected to a revamped 45 kilowatt emergency stand-by generator on the premises, and the newer boat-house had been completely rewired. Further, approximately three-quarters of the cabins rested on poured slab foundations, rather than the less preferable cedar post foundations, which were commonly found in northern Minnesota and which were the norm at Mr. Fruen's four comparable properties.

Further, this Court finds that the winterization of the motel and of the cabins added substantially to the value of the Snowbank Lodge resort. Mr. Fruen expressly discounted the value of the plaintiff's winterization program in his assessment of fair market value. The defendant argues that, since snowmobiles were prohibited from using the BWCAW in 1976, the resort's suitability for accommodating winter guests added no increment of value to the property. This Court is unpersuaded, however, that the winterization of the resort buildings should be discounted entirely. Mr. McCallick testified that the resort also served hunters, cross-country skiers, and ice fishermen. It is illogical for the defendant's expert to argue that the winterization of the cabins would play no part whatsoever in a prospective purchaser's appraisal of the property. It clearly would be an element that any purchaser would consider in determining fair market value. Winterization clearly extends a resort's season and makes year around operation a distinct possibility even with a snowmobile ban in effect for portions of the surrounding land.

The valuation of real property is by no means an exact science, as is amply demonstrated by the disparity of opinion between Mr. Hawkinson and Mr. Fruen. The differing opinions of the witnesses can be attributed, in part, to the different appraisal methods selected by each man. The cost

approach as utilized by Mr. Hawkinson resulted in an upper-limit valuation which, in this Court's view, exceeds the amount an informed purchaser would ever consider paying for the Snowbank Lodge property. Further, to the extent that Mr. Hawkinson added the replacement cost of various improvements existing on the Snowbank Lodge property (such as the lodge and motel buildings) to the adjusted sale prices of his comparison properties, this Court believes that he impermissibly injected the replacement cost approach into his fair market value analysis. In contrast, Mr. Fruen's comparison sales analysis fails to provide a detailed explanation of the fair market value analysis which he undertook.

As a result of the inherent defects in both Mr. Hawkinson's and Mr. Fruen's appraisal of the subject property, particularly the lack of truly comparable sales, this Court allowed into evidence the Government's appraisal report of the Snowbank Beach Resort, after testimony by Mr. Fruen indicated that the Snowbank Beach resort may be the only truly comparable property to the Snowbank Lodge resort. Mr. Fruen indicated that he absolutely would have used the Snowbank Beach resort sale as a comparable sale in his appraisal report, if the sale had occurred prior to his completion of his appraisal report for the Government. This was true even though the "sale" was the same type of sale this Court is dealing with in this case, i.e., a buy-out sale pursuant to section 5(a) of the BWCAW Act.

The Snowbank Beach resort, like the subject property, is located on Snowbank Lake some two miles from the subject resort and was appraised at $432,500, as of July 1, 1978 ($476,000 as of January 12, 1981). The resort was situated on 9.17 acres of land, with 2,640 feet of lake frontage. The subject property had 10.75 acres, with 3,250 feet of lake frontage.

The Snowbank Beach property included the following improvements: an owner's residence; a main lodge; twelve cabins; a boathouse; and several secondary improve-

ments, including a garage, a laundry building, a pumphouse, a storage shed, and a number of miscellaneous outbuildings. Specifically, the twelve cabins included: (1) two three-bedroom, half log sided frame structures, with knotty pine paneled walls, built in 1946; (2) four log cabins, having two or three bedrooms, built around 1930; (3) a three-bedroom, frame structure, having one-half vertical log siding, built around 1920; (4) a two-bedroom, frame structure, having a cedar exterior and a knotty pine paneled interior, built around 1930; (5) a four-bedroom, frame cabin; (6) two four-bedroom, frame structures, having a split-plank exterior and a knotty pine paneled interior, built in 1965; and (7) a one-bedroom, frame structure, with knotty pine paneled walls, built in 1979. All of the above cabins were heated, had indoor plumbing, and were in good to very good condition. As a result, the above cabins are clearly comparable to the subject property. Snowbank Lodge, however, has eight more cabins than does Snowbank Beach resort. Further, while the Beach resort had a five-unit campground, Snowbank Lodge had a much larger fifteen-site campground.

The Snowbank Beach resort's main lodge contains, on its lower level, an office, a reception area, a game room, a cocktail lounge, restrooms, and a kitchen. Its second floor provides eight sleeping rooms for the resort's employees. Unlike Snowbank Lodge, the Snowbank Beach resort's main lodge does not have the unique appearance or beauty of the white pine main lodge at the subject property. Further, it appears that the Snowbank Beach lodge has no dining room, no dance area, and no room accommodations similar to the plaintiff's property. Snowbank Lodge's main lodge has a dining room capable of seating 180 people, a large kitchen capable of feeding 180 people, a game room, a cocktail lounge with a dance floor, a two-bedroom apartment and two motel-style rooms. In addition, while the subject property's main lodge was entirely heated, the Snowbank Beach main lodge was only partially heated, with no heat on its upper level. Fur-

ther, while the subject property had a liquor license, the Snowbank Beach resort did not.

The Snowbank Beach resort's boathouse is approximately four or five years old and provides both a fish cleaning and a maintenance area. The Snowbank Lodge property has two boathouses, as discussed above. The newer of these is a two-story, fully winterized frame structure, with nine separate modern bedrooms on its upper level and with a laundry room, a tackle shop, a game room, and a maintenance area on its lower level.

Further, Snowbank Beach had no improvements comparable to the plaintiff's motel, a two-story, fully winterized frame structure. This motel, constructed in 1972, had nine motel-type rooms on its upper level and three three-bedroom apartments on its ground floor. In addition, large picture windows provided an excellent view of Snowbank Lake.

The Snowbank Beach resort, however, included a two-bedroom, main residence. While Snowbank Lodge had a similar main residence, this improvement was not included in the sale of the subject property to the Government.

In addition to all of the above, Snowbank Lodge was superior to the Snowbank Beach resort for several other reasons: (1) the plaintiff's winterization program was far more extensive than anything undertaken at Snowbank Beach; (2) the subject property's modernization program appears to have been more extensive—the roofs on the main lodge and all of the cabins were replaced, carpeting was installed in every cabin, and the entire septic/sewer system was replaced; (3) the plaintiff owned all of the electric delivery equipment located on the Snowbank Lodge property; and (4) there is no mention in the Snowbank Beach appraisal report that an emergency standby generator was available in the event of a power failure.

As a result of these significant differences between Snowbank Beach and Snowbank Lodge, this Court is unable to agree

with the Government that the fair market value of the subject property is only $92,500 more than the fair market value of the Snowbank Beach resort, which the evidence indicates that the Government did not challenge. Therefore, this Court is left with the difficult task of determining the fair market value of the plaintiff's property. After a careful analysis of all of the evidence and of all of the testimony, this Court feels that the determination of fair market value must be based on the comparison sales approach. However, in view of the inadequacies of the defendant's appraisal, and in light of the appraisal of the Snowbank Beach resort property, this Court is compelled to use the comparison sales analysis provided by the plaintiff's expert, Mr. Hawkinson. As mentioned above, this Court finds that Mr. Hawkinson's coupling of his comparison sales analysis with a partial replacement cost analysis is contrary to the established tenets governing the use of the comparison sales approach.

The Court has decided, therefore, to utilize the comparison sales analysis of Mr. Hawkinson in determining the fair market value of the subject property, after first disregarding his replacement cost "value additions." Mr. Hawkinson determined that the adjusted sale price of Stillwell's Resort was $728,000, that the adjusted sale price of the Kawishiwi Resort was $630,000, and that the adjusted sale price of Moose Lake Lodge was $912,072. The Court has determined that the multipliers used by Mr. Hawkinson, in arriving at the above adjusted sale prices, adequately adjusted for the dissimiliarities between the comparison properties and Snowbank Lodge. As a result, the "value additions" were unneeded. The average of the above three comparison sale prices is $756,690.66, rounded to $756,691, which this Court finds to be the fair market value of the Snowbank Lodge resort, on October 27, 1978. While the Court recognizes that its adoption of Mr. Hawkinson's comparison sales analysis may be open to minor factual challenge, after considering all of the testimony and all of the evidence, it feels that the above valuation represents a fair and equitable determination of the fair market value of the subject property. This figure also equates roughly with what this Court believes a knowledgeable purchaser would offer the Snowbank Lodge Resort owners with knowledge of the truly comparable Snowbank Beach property.

In addition, in view of this Court's familiarity with the northeastern Minnesota resort area, as set out in the record of this case, the Court finds that the above figure reflects a fair and reasonable price for the property at issue.

The plaintiff is therefore entitled to recover $756,691, upon the transfer of title of its property to the defendant.

### E. *Interest*

■ The plaintiff seeks to recover interest on the judgment of this Court. It is by now well established that the Government cannot be held liable for the payment of interest on unpaid claims, in the absence of an express statutory or contractual provision authorizing such payment. *See United States v. Thayer-West Point Hotel Co.*, 329 U.S. 585, 588, 67 S.Ct. 398, 399, 91 L.Ed. 521 (1947). The BWCAW Act contains no authorization for the payment of interest on claims filed under section 5(a).

However, an exception to this general rule is found in the context of actions for just compensation under the fifth amendment. The courts have consistently held that just compensation includes the award of interest from the date of taking to the date of payment. *Id.* As a result, the plaintiff argues that the regulatory scheme imposed by the BWCAW Act was so "pervasive that it substantially precluded Plaintiff from operating its property as a commercial resort" and that the Government's delay in purchasing the plaintiff's property effected a taking by inverse condemnation, thereby entitling the plaintiff to recover interest on the judgment award of this Court. In this regard, it is significant to note that the plaintiff failed to raise its inverse condemnation claim until long after the close of proof in this case. Although

the plaintiff indicated in a pretrial submission, filed with the Court, that it sought interest "[b]ecause of the Fifth Amendment underpinnings of Plaintiff's cause of action * * *," the plaintiff did not try its case on a theory of inverse condemnation. It was only in the plaintiff's post-trial reply brief, filed in response to the defendant's post-trial brief, that the plaintiff argued that the Government's actions constituted a taking by inverse condemnation.

It would be a gross inequity, at this late stage in the proceedings, to permit the plaintiff to argue its entitlement to interest on the basis of a claim of taking by inverse condemnation. The plaintiff had every opportunity to raise this claim at an earlier time, and it was apparently only as an afterthought that this claim has been raised at all. In any event, it is highly unlikely that the plaintiff would have recovered on a theory of inverse condemnation, even if it had been properly raised.

 It is well established that governmental regulation can effect a taking of property. *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 123–28, 98 S.Ct. 2646, 2658–61, 57 L.Ed.2d 631 (1978); *Deltona Corp. v. United States,* 228 Ct.Cl. 476, 486, 657 F.2d 1184, 1190 (1981), *cert. denied,* 455 U.S. 1017, 102 S.Ct. 1712, 72 L.Ed.2d 135 (1982). However, a mere diminution in the value of property, standing by itself, is insufficient to constitute a taking. *Penn Central Transp. Co. v. New York City, supra,* 438 U.S. at 124, 98 S.Ct. at 2659. The Government could hardly go on if, to some extent, values incident to property could not be diminished without the Government having to pay for every such change. *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 413, 43 S.Ct. 158, 159, 67 L.Ed. 322 (1922). To constitute a taking, therefore, a regulatory scheme must so diminish the value of a property interest as to result in the total destruction of that interest. *Armstrong v. United States,* 364 U.S. 40, 48, 80 S.Ct. 1563, 1568, 4 L.Ed.2d 1554 (1960).

 The restrictions imposed by the BWCAW Act do not rise to this level. The Act in no way precluded the plaintiff from occupying its property or from operating the Snowbank Lodge resort. Rather, the Act regulated the uses of land lying within the borders of the BWCAW. The plaintiff's property lies *outside* those borders and is not itself subject to direct regulation under the Act. The plaintiff may freely choose to operate some of their resort activities within the BWCAW, but such activities would have to conform to the rules and regulations imposed on every other user of the BWCAW. Although the Act may have curtailed some of the plaintiff's business expectations, the Act in no way deprived the owners of the total beneficial use of their property. In the final analysis, the BWCAW Act gave the plaintiff an option to sell their property to the Government at its fair market value, without interest. The plaintiffs have elected this approach and cannot now recover fair market value plus interest. Moreover, the plaintiff never operated its resort under the strictures of the BWCAW. Rather, the plaintiff gave notice to the Government that it desired to invoke the buy-out provision of the Act a mere five days after the Act became effective.

This Court has also considered the plaintiff's alternative argument—that the Government's delay in purchasing the plaintiff's property constitutes a taking—and finds it likewise without merit. Therefore, the plaintiff is not entitled to recover interest on the judgment of this Court.

## CONCLUSION

This Court finds that the fair market value of the Snowbank Lodge resort, as of October 27, 1978, was $756,691. Judgment will enter in the plaintiff's favor in the total amount of $756,691, to be paid upon the transfer of title of the Snowbank Lodge property to the Government. The plaintiff may not recover interest on the judgment of this Court.